**Floyd FEATHERSTON**

v.

**Ramsey CLARK et al.**

**Civ–68–20–DR.**

United States District Court
W. D. Texas,
Del Rio Division.

Nov. 5, 1968.

As Amended Jan. 27, 1969.

Ben F. Foster, Gordon G. Hawn, San Antonio, Tex., John R. Foster, Del Rio, Tex., for petitioner.

Ralph H. Harris, III, Asst. U. S. Atty., Del Rio, Tex., Ernest Morgan, U. S. Atty., San Antonio, Tex., for respondents.

## MEMORANDUM ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

SUTTLE, District Judge.

Beginning on the 28th day of October, 1968, came on to be heard the above styled and numbered Petition for Writ of Habeas Corpus, and the same was finally submitted on the 1st day of November, 1968, on the basis of the petition and exhibits attached thereto, the Return of Respondents herein, Traverse to Return, Supplemental Reply of Government, Petitioner's Traverse to Supplemental Reply,* and the exhibits and testimony introduced and admitted at the hearing herein, and the files and records in the case of United States of America vs. Floyd Featherston, Nos. CR–68–25–DR and CR–68–47–DR.

### I.

The petitioner, Floyd Featherston, is charged with having knowingly and wilfully attempted to evade and defeat part of the Income Tax due and owing by him and his wife for the years 1961 (CR–68–47–DR), and 1962 and 1963 (CR–68–25–DR), in violation of 26 U.S.C. § 7201, by filing a false and fraudulent income tax return for each of those years. At his initial arraignment on February 17, 1968, the petitioner pled not guilty to all counts of both indictments (except Count I of CR–68–25–DR, which was later dismissed). Before the plea was accepted by the Court, the following exchange took place between the Court and petitioner's counsel:

THE COURT: Mr. Hawn, there is no issue of mental competency, is there?

MR. HAWN: No, Sir, we are not going to raise that issue.[1]

Trial was to be set for June 17, 1968, but because of a possible conflict with other business of defense counsel, the case was set for trial for May 6, 1968.

On March 4, 1968, petitioner filed his pre-trial motions. The Government's responses thereto were filed on March 27, 1968, and all motions were heard and determined by the Court March 28–29, 1968. A written order, setting out the determinations made in open Court and the reasons therefor, was entered September 16, 1968.

Prior to May 6, 1968, it became clear that the Court could not keep the trial setting, because of a protracted trial in El Paso, Texas,[2] and the petitioner's case, along with the rest of the trial docket in the Del Rio Division, was continued, by order of April 22, 1968, to be reset at a later date. Trial was then set for July 15, 1968, but was later reset for July 22, 1968, pursuant to a request from Mr. Hawn, in his letter of June 10, 1968, for the convenience of the petitioner and counsel. The three weeks of criminal jury trials set for July in Del Rio, however, were all passed to corresponding weeks in September, with petitioner's case set for trial on September 16, 1968.

The petitioner, through letters from Mr. Hawn on August 27 and 28, 1968, and, at the request of the Court, by written motion filed September 5, 1968, sought a continuance of the case past the September setting, on the ground that Mr. Ben Foster was physically indisposed. This request was opposed by the Government,[3] and, after a hearing,[4] was

---

* See note 11, infra.

1. While the Court took this answer to mean that there was no issue of mental competency, it is unclear now, in light of subsequent events, whether Mr. Hawn meant that there was no such issue, or that there was such an issue but that he did not intend to raise it.

2. Hearings on pre-trial motions began on February 16, 1968, and continued until

March 19, 1968. The jury trial began on April 8, 1968, and continued until the verdict was returned June 26, 1968.

3. In a letter to the Court of August 28, 1968, the Government took the position that since Mr. Hawn had represented the petitioner up until that time, he could adequately represent him at the trial.

4. The correspondence to the Court on this matter, from both sides, was entered into

denied by the Court September 5, 1968, as set out in the Order Determining Motions entered on September 16, 1968. The jury was selected on September 16, 1968, and the case proceeded to trial the following day, with Mr. Foster acting as lead counsel.

On October 3, 1968, the government rested. The petitioner filed various motions, one of which was a Motion for Production, based upon Brady v. State of Maryland.[5] Pursuant to this motion, the Court examined further all of the matters previously gone into *in camera*, in addition to the entire Government file of the case. In going through the report of Special Agent Hughes, which had previously been examined by the Court and sealed,[6] pursuant to a request of the petitioner under the Jencks Act,[7] the Court read a Memorandum of Conference relating to a meeting between Mr. Hawn, David E. Gaston (an I.R.S. attorney) and Glen D. Harrison (an I.R.S. Technical Adviser) in Dallas, Texas, September 23, 1966, and prepared and signed by Messrs. Gaston and Harrison. The relevant parts of this Memorandum read as follows:

" * * * He [Mr. Hawn] added that we might be interested in knowing that Mrs. Featherston had part of a lung removed last year and was in pretty bad shape for a while. However, Mr. Hawn does not know what Mrs. Featherston's present health is. * * *.

"Mr. Hawn stated that Mr. Featherston is a diabetic, having to have periodic insulin shots. It is felt that Mr. Featherston has suffered damage to his heart from this condition. Mrs. Featherston has stated to Mr. Hawn that Mr. Featherston has had periods of blacking out for as much as several days at a time. Mrs. Featherston and Mr. Featherston have both indicated to Mr. Hawn that he (Featherston) did not know where he was or what he had done during these periods of blackout. According to Mrs. Featherston, these periods of blackout were 'frequent,' though she has given no explanations as to what she meant by 'frequent.' " [8]

In disposing of the Motion for Production in open Court, the Court mentioned these matters to the petitioner and his counsel as being possibly relevant on the issue of punishment, should the petitioner be convicted, even though, in the Court's mind, the defense had complete knowledge of such matters, their having originated, so far as the Government's file is concerned, with Mr. Hawn.

The petitioner proceeded to put on his case. Near the end, during a recess for defense counsel and the Government to iron out any difference they might have regarding the summary charts the petitioner was to use in connection with his summary witness, the same having been done previously with the Government's charts, the petitioner asked to take another witness, Dr. George Herrmann, next. The Government approached the Court to voice in advance the objections he might have. The Court thought Dr. Herrmann was to be a character witness

evidence at this hearing and is thus part of the record. A telephone call from Mr. Hawn to the effect that petitioner was about to be admitted to a hospital and could not be at the hearing was received by this Court's secretary. Mr. Hawn was told to file a written motion for continuance. None was filed. The petitioner appeared at the hearing.

5. 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

6. The sealed portion of this report was marked Government's Tender No. 24, and made a part of the record herein.

7. 18 U.S.C. § 3500.

8. While this Memorandum was tendered to the Court as part of Government's Tender No. 24 on September 30, 1968, it appearing that it was not a "statement" of the witness Hughes, within the meaning of 18 U.S.C. § 3500(e), the body of the Memorandum was not examined by the Court. The Memorandum was not read in its entirety by the Court until the morning of October 4, 1968. The quoted portion represents everything in the Memorandum regarding the petitioner's physical or mental condition.

for the petitioner. The Court was informed, however, that Dr. Herrmann would testify as to petitioner's "blackouts" and the Government stated that if there was evidence to question petitioner's mental competency the Government would be forced to ask for an examination and judicial determination of mental competency. The Court explained the procedure for such an examination under 18 U.S.C. § 4244 for the benefit of defense counsel, and voiced his concern lest Dr. Herrmann's testimony result in a mistrial. It developed that one purpose of the doctor's testimony was to explain the petitioner's failure to take the witness stand.[8a] The Court determined to hear Dr. Herrmann's testimony outside the presence of the jury.

Through the testimony of Dr. Herrmann, the physical and mental condition of the petitioner, from 1959 or 1960 until the present, was developed. It developed that what Mrs. Featherston meant by "blackouts," was periods of from 48 to 72 hours in which the petitioner would transact business and behave normally, but during which he would not be fully aware of what he was doing or where he was, and about which he would remember nothing afterward. These periods would come and go with no outward warning, and can not be detected by even a physician, without chemical tests, unless in its most chronic stages when the subject is near a coma or semi-conscious. This condition may or may not have existed on each day of the trial. The Government moved that the petitioner be examined and that a judicial determination of mental competency be made before continuing with the trial. The Court explored the situation with defense counsel, who opposed the motion, and with the witness. Finding reasonable cause to believe that the petitioner may be presently mentally incompetent, the Court granted the Government's motion, committed the petitioner on the Government's and the Court's motions for an

examination pursuant to 18 U.S.C. § 4244, and declared a mistrial in the case. The petitioner was taken into custody of the United States Marshal to be transported to a suitable hospital or other facility to be designated by the Attorney General of the United States for observation, examination and possible treatment, and for a report, such commitment not to exceed ninety (90) days. An order to that effect was entered the same day, October 8, 1968, as well as an order declaring a mistrial in the criminal proceedings.

## II.

The following day, October 9, 1968, Dr. Herrmann, who was the Federal Jail Physician as well as petitioner's personal physician, recommended to the Marshal that petitioner be transferred to a local hospital. The Marshal contacted the Court, and the necessity of hospitalization of petitioner was explored by the Court, the Marshal, and Dr. Herrmann, with a record being made. It was agreed that, for the time being, petitioner should remain in the jail pending further developments and possible immediate transfer to a Federal institution, but that the petitioner was to be transferred to a local hospital in the event that Dr. Herrmann decided it was necessary to the health of the petitioner. An order to that effect was entered the same day, October 9, 1968.

The following day, October 10, 1968, petitioner moved the Court, through his counsel, to Vacate and Set Aside this Court's Order for Psychiatric Commitment. This motion requested that petitioner be examined by local psychiatrist, without commitment, or, in the alternative, that the Marshal be ordered to transfer him to a hospital in Del Rio, where he could be examined, with guards, if necessary, paid for by petitioner. On the same day, however, petitioner was taken to the Val Verde County Hospital, at the request of Dr. Herrmann, where it

---

**8a.** Testimony at the hearing on this petition suggests that another purpose was to raise a doubt as to petitioner's mental capacity, at the time of the offense, to form the specific intent necessary to convict.

was determined he had suffered a coronary insufficiency. The Government's Reply to said Motion to Vacate was filed the same day.

On the following day, after a conference with the local counsel involved, the Court determined that its Order Authorizing Hospitalization and the subsequent removal of the petitioner to the hospital rendered the alternative prayer of the Motion to Vacate temporarily moot, since petitioner was in the hospital under guard as requested. The Court, therefore, decided to pass the remaining matters in the motion until petitioner was remanded to the jail, and would thus be able to attend the hearing on all of the matters presented in the Motion to Vacate. A written order to that effect was entered the same day, October 11, 1968.

### III.

On October 15, 1968, petitioner filed his Petition for Writ of Habeas Corpus and Brief in Support thereof in the San Antonio Division of the United States District Court for the Western District of Texas. The Government, on behalf of the Respondents, filed its Return and Memorandum of Authorities on October 16, 1968, along with a Motion to Transfer Venue of the Petition and to Consolidate the proceedings thereon with the Motion to Vacate, both instruments presenting similar issues. Petitioner filed his Traverse to Return and Reply Brief to Memorandum on October 18, 1968, still in the San Antonio Division of this Court.

On October 22, 1968, the Honorable Adrian A. Spears, Chief Judge, United States District Court for the Western District of Texas, consistent with an in chambers conference with counsel for both sides on October 15, 1968,[9] transferred the cause to this, the Del Rio Division.[10] The pleadings in the case were completed after the filing in Del Rio of the Supplemental Reply of the Government on October 24, 1968, and the Petitioner's Traverse thereto on October 25, 1968.[11]

On October 24, 1968, the Court was informed by John R. Foster, associated local counsel for petitioner, that Mr. Featherston had been released from the hospital and returned to the Jail. The Court, by written orders entered the same day, set both the Motion to Vacate in the criminal case and the Petition for Habeas Corpus for hearing the following Monday, October 28, 1968.

At the hearing, the petitioner introduced as exhibits certain papers in the case and testimony began. The hearing was recessed late October 28, 1968, for one of defense counsel to seek additional advice as to a possible fifth amendment problem, and was resumed at 5:00 p. m. October 31, 1968. The hearing on the Petition, Motion to Vacate, and other collateral matters which had risen during the proceedings, was concluded November 1, 1968.[12]

### IV.

Petitioner claims that the mistrial declared in this case was improvidently granted, and that, therefore, he has been once placed in jeopardy and cannot be tried again on these charges. Thus, his further confinement is illegal and unconstitutional and he should be immediately

---

9. A transcript of this hearing is in the record as an exhibit.

10. The papers were received in this Court October 23, 1968.

11. During the proceedings in this case, a question of the propriety of the initial pleadings was raised, and petitioner, through his counsel, tendered a new set of pleadings, to be substituted for the originals, October 31, 1968. The Court disallowed substitution, but ordered the new instruments filed as amended pleadings herein.

12. This rather lengthy narrative, in parts I, II, and III, shall constitute this Court's findings of fact in this case. While the majority of the facts set out are not directly relevant to the legal question involved, a complete statement was deemed advisable in light of the difference between the parties as to what did and did not happen. To the extent the allegations of facts in the pleadings in this case are inconsistent with parts I, II, and III, the Court finds they are incorrect.

released and the criminal charges dismissed. In briefing the question, both sides begin with the language in United States v. Perez,[13] to the effect that

> "We think * * * the law has invested Courts of Justice with the authority to discharge a jury * * * whenever, in their opinion, taking all of the circumstances into consideration, there is a manifest necessity for the act, or the ends of justice would otherwise be defeated."

Predictably, the Government relies on cases emphasizing the "discretion in the trial judge to declare a mistrial * * * if the ends of justice will be best served,"[14] and the petitioner relies on cases emphasizing that the Trial Judge must find a "Manifest" or "imperious necessity" for the act.[15] The Government contends that the declaration of a mistrial in this case was a reasonable and just exercise of this Court's discretion. The Petitioner contends that this Court "did not even attempt to exercise his judicial discretion," and, if he did, he "refused to even consider the circumstances in the case and made an arbitrary decision" amounting to "Judicial neglect."[16]

The exercise of judicial discretion, as was required in this case, on the trial level, is often made hurriedly with the underlying considerations sometimes obscure to the parties involved. It is reviewed, either by the Court of first instance or by the appellate court, with time for reflection on the considerations involved and with the benefit of hindsight. The exercise of this Court's discretion in this case evidently appeared "arbitrary" to petitioner, apparently without reason, and is here attacked by him in the same manner in which he claims the decision was made, i. e., without consideration of the factors involved, or the effects of the position he urges.

After Dr. Herrmann testified as to the physical and mental condition of the petitioner during the prosecution years of 1961, 1962, and 1963, and that this condition was the same today, the Court was presented with a serious situation with regard to the status of this case. The questions of who brought out the testimony are largely irrelevant. The fact remains that at that time, the Court and the United States Attorney had "reasonable cause to believe that [petitioner] * * * may be presently * * * so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense."[17] Under section 4244 a judicial determination of the mental competency of petitioner *had* to be made. To aid in making this determination, the Court, again by mandate of the statute, ordered the petitioner examined by a psychiatrist, and, in its discretion, ordered the petitioner committed for the purpose of the exam-

13. 22 U.S. (9 Wheat.) 579, 580, 6 L.Ed. 165 (1824).

14. Brock v. State of North Carolina, 344 U.S. 424, 427, 73 S.Ct. 349, 350, 97 L.Ed. 456 (1953); see e. g., Wade v. Hunter, 336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949); Scott v. United States, 91 U.S. App.D.C. 232, 202 F.2d 354 (1952); United States v. Levy, 232 F.Supp. 661 (N.D.Fla.1964).

15. See, e. g., Downum v. United States, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100 (1963) (While distinguishable on its facts from the instant case, Downum has also been criticized in Moore, 8 Federal Practice, Par. 29.08 [1], n. 2); Green v. United States, 355 U.S. 184, 187–188, 78 S.Ct. 221, 2 L.Ed.2d 199, 61 A.L.R.2d 1119 (1957); Cornero v. United States, 48 F.2d 69, 74 A.L.R. 797 (9th Cir. 1931).

16. Brief in Support of Petition of Floyd Featherston for a Writ of Habeas Corpus, pp. 3, 5, 6, 7–8.

17. 18 U.S.C. § 4244. There was much discussion in the pleadings, briefs, and testimony on this petition about who knew of petitioner's mental condition and its ramifications first. The only relevant inquiry here is, When did the Court know? Contrary to the allegations in the Petition and Brief in support thereof, the Court became aware of the problem at the same time everybody else claims they became aware of it, i. e., at the time Dr. Herrmann testified.

ination to a facility to be designated by the Attorney General.

██ Petitioner first contends that the issue of his present mental competency was never raised. The Court finds that the issue was raised, as Dr. Herrmann's testimony raised a reasonable cause to believe that petitioner might be then, and possibly throughout the trial, incompetent within the meaning of Section 4244. While his condition has its onset with physiological changes; i. e., increased acetones and ketones in the blood; its results were and can be psychological; i. e., loss of memory and periods in which petitioner behaves normally but knows nothing of what he is doing. It clearly makes no difference what the cause of mental incompetency is, if the result renders petitioner unable to understand the proceedings against him or to properly assist in his own defense.[18]

█ Petitioner next contends that, if the issue was raised, he did not raise it and, in fact, opposed its being raised. This, he contends, distinguishes the instant case from United States v. Levy,[19] in which the defendant asserted mental incompetence after swearing of the jury. This Court holds that it makes no difference who raised the issue, or, for that matter, whether anyone "raised" it. Once there is reason to believe, whether from the evidence in a case, comments of counsel, behavior of the defendant or whatever source, that a defendant in a criminal cause may be mentally incompetent within the meaning of Section 4244, it is mandatory that he be examined by a qualified psychiatrist and that the Court determine his mental competency before the proceedings continue.[20]

Petitioner next contends that even if the above is true, the Court abused its discretion in committing him to the custody of the Attorney General for such examination, thus necessitating a mistrial in the case. Petitioner, urging that he is presently competent, contends that the Court could have, recessing the trial, had him examined by a local psychiatrist, made the determination that he was and is competent, and continued to verdict. In failing to do this, he continues, and in taking more drastic measures than the facts warranted, the Court abused its discretion and, for all practicable purposes, ended the criminal proceedings. It is here that we reach the heart of the problem, and it is here that petitioner confuses or overlooks the considerations that controlled the Court's action in this case.

The Court committed petitioner for the purpose of a mental examination, rather than order an examination by some other means, because of the peculiar situation of this Court, past experience with "local" psychiatrists, and the nature of the competency question raised. First, there is no "qualified psychiatrist," as is required by Section 4244, in or around Del Rio, Texas. The nearest place at which petitioner could have received the quality examination he deserves would have been in San Antonio, Texas, approximately 150 miles from Del Rio. The designation of a psychiatrist in San Antonio, a city unfamiliar to this Court, could have been made only with the help and advice of Government officials in that city. Even when this is done, the Court can never be sure of the quality or quantity of attention a defendant receives from a "local" psychiatrist, unfamiliar with the issues involved and unaccustomed to the type of information and report the Court needs under Section 4244. This has been a recurring problem for this Court, and has, admittedly, caused this Court to favor

---

18. Cf. Pledger v. United States, 272 F.2d 69 (4th Cir. 1959) (Narcotics in blood).

19. Supra, at n. 14.

20. 18 U.S.C. § 4244. Again, it is clear from the files, records, and evidence in

the case that neither the Court nor the Government had such reasonable cause until Dr. Herrmann testified. See n. 17, supra.

Government facilities, where the quality of examination is consistent and where the type of information needed is well known, and furnished in a thorough report directed thereto. This Court's reference to Nagell v. United States [21] was to point out the trouble this Court has had with "local" psychiatrists. This Court's decision in this case, to commit the petitioner, while influenced by past experience, as all judicial decisions are, was *not,* as petitioner alleges, "an overreaction to a case in which he [this Court] was reversed." [22]

The primary factor the Court relied upon in its decision to commit petitioner for examination, rather than rely upon a hasty examination of local psychiatrists, was the nature of the competency issue raised in this case. Here we have a condition which has existed from about 1959 until the present. This period includes the prosecution years involved in this case, as well as the time petitioner will be tried. The condition is one which is wholly within the control of the petitioner. The doctor testified that the acetone/ketone count could be kept low only so long as petitioner maintained a proper diet and regular insulin injections. The scope of the problem, as will be discussed below, was and is much broader than what petitioner's mental capacity was on October 8, 1968. There is a serious problem with regard to how this petitioner can be tried and still be assured that he is mentally competent at each stage of the proceedings against him, within the meaning of the law. The problem is a new one to the Court, and it was and is felt that a thorough and complete examination, by Government doctors familiar with the legal standards, is needed to aid the Court in its solution.

■ All of the above considerations impelled the Court to exercise its discretion in favor of commitment of peti-

tioner for the purpose of psychiatric examination, and it is upon these same considerations that the Court has refused to change his mind, and hence denied the petitioner's Motion to Vacate and Set Aside this Court's Order for Psychiatric Commitment. While petitioner's other health problems are indeed regrettable, these too will receive complete medical attention at whatever Federal institution the Attorney General should designate, and in any event can not insulate this petitioner from custody, consistent with due process.

■ The point petitioner misses is that a mistrial in this case was "manifestly necessary" *regardless* of how or where the mental examination of petitioner was held. A temporary recess of the trial, to be resumed after an examination and report of a local psychiatrist and a judicial determination, if warranted, that petitioner was competent on October 8, 1968, the day all this arose, would *not* have "saved the trial" as petitioner alleges. While this procedure would have settled the question of petitioner's mental competency on that day, it would have told the Court nothing of his mental competency during the prior three-and-one-half weeks of trial. The nature of petitioner's condition is such that even a physician cannot tell if he is in one of his "spells" or "blackouts" by mere observation, and only a contemporaneous blood test and examination can reveal whether petitioner is truly normal on any one day. Thus, a conviction in this case would have meant nothing. It would forever be open to attack on grounds that could not have been refuted by the Government or determined against the petitioner by the Court. It is clear that a conviction, whether the result of a jury verdict or a plea of guilty, may be attacked collaterally on the grounds that the defendant was not mentally competent at

21. 392 F.2d 934 (5th Cir. 1968). Largely as a result of low quality "local psychiatrist" this case was tried twice before it was finally dismissed.

22. Brief in Support of Petition of Floyd Featherston for a Writ of Habeas Corpus, pp. 5, 8.

the time, regardless of whether the issue was ever raised before judgment.[23] It is even more clear that a defendant, a question of his mental competency having been raised, cannot intelligently waive such right, since it would never be clear that such waiver, if ever effective, which this Court doubts, was a product of the defendant's will or made while in fact incompetent.

Petitioner complains finally that the mistrial came too late, after he had exposed his theory of defense to the Government. This is not a valid consideration. Exposure of defense theory has never precluded a new trial where the ends of justice were to be served thereby. Motions for new trial are granted by trial courts, retrials are granted through post-conviction procedures, and cases are reversed for retrial on appeal. Defendant is no more prejudiced by disclosure than the Government. Neither is entitled to a favorable verdict based upon surprise or secrecy.

Here the mental competency of petitioner was called into question, and the Court, in order to protect petitioner, perhaps from himself, and to insure that justice be served, considering all of the circumstances, declared a mistrial. It is regrettable that so much time and effort was wasted, but this again can not control where the defendant's Constitutional rights to be tried only when able to understand the proceedings against him and to properly assist in his own defense are at stake. In the long run, time may have been saved. Upon retrial this problem will not arise. While unique, the situation is amenable to solution. It may take a

blood test of petitioner every morning of the trial and constant supervision by a physician. Whatever it takes, defendant and Government alike will be assured of a trial conducive to the development of the truth and which will finally end the matter, without the shadow of possible retrials. The previous proceedings could offer no such assurance.

In summary, the Court, taking all of the circumstances into consideration, finds that there was a manifest necessity for a mistrial in this case, and that without such action the ends of justice would otherwise have been defeated. The Petition of Floyd Featherston for Writ of Habeas Corpus must therefore be, and the same is hereby, in all things, denied, and it is so ordered.

**V.**

This Memorandum Order is entered in lieu of findings of fact and conclusions of law pursuant to Rule 52 (a), F.R.Civ.P. While the Court's ruling was entered in open Court on November 1, 1968, and petitioner voiced his intention to appeal this Order, the times for filing formal notice of appeal and perfecting same shall run from the date of this Memorandum Order.

Since an appeal will apparently be taken, however, it is ORDERED that petitioner be permitted to remain on the conditions of release set by this Court by order entered October 31, 1968; PROVIDED THAT, petitioner be limited to travel in the Western District of Texas only, without prejudice to written motion and judicial determination, after consultation with Dr. George Herrmann, that further travel is necessary and not

23. Cf. Johnson v. United States, 293 F.2d 100 (5th Cir. 1961); Pledger v. United States, supra at n. 18; Gregori v. United States, 243 F.2d 48 (5th Cir. 1957).

It is interesting to note that upon being presented with this petition in San Antonio, Judge Spears' initial reaction to the situation was

" * * * if there is any question raised during the trial of the case about a man's competency to stand trial and

if the Judge does not take some action at that time, it seems to me that under the decisions of the Court of Appeals for the Fifth Circuit, that he is just laying himself open to 2255's and habeas corpus and every other sort of post conviction remedy that can be conjured up by the mind of man; if his own lawyers don't do it, they have got jail house lawyers to do it with reckless abandon." supra at n. 9.

inconsistent with the petitioner's health and safety, this *proviso* notwithstanding any oral directions previously made by the Court; and PROVIDED FURTHER THAT, if appeal is not perfected within the time allowed by the Federal Rules of Appellate Procedure, the Marshal shall take custody of petitioner and proceed under this Court's Order for Psychiatric Commitment, entered October 8, 1968.