**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Harry Wayne PARKS, Defendant-Appellant.**

**No. 71–1427.**

United States Court of Appeals, Fifth Circuit.

May 2, 1972.

Richard Davis, Tampa, Fla. (Court-appointed), for defendant-appellant.

John L. Briggs, U. S. Atty., Richard H. McInnis, Asst. U. S. Atty., Tampa, Fla., for plaintiff-appellee.

Before JOHN R. BROWN, Chief Judge, and INGRAHAM and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

On March 1, 1969, Harry Wayne Parks forged a United States Government V.A. check and received $136 lawfully payable to Herman E. Walker. His picture, his handwriting and his presence at the indicated address all confirmed that he had done the deed. The only defense was a lack of criminal responsibility due to mental illness—a defense which the jury was disinclined to accept. On review of the record, how-

738

ever, we conclude that the implicit finding of sanity is so contrary to the manifest weight of the evidence that the District Court erred in refusing to grant a new trial. F.R.Crim.P. 33.

The Government's case was well presented. It adequately demonstrated that Parks was living at 2611 Tyson Avenue in Tampa, Florida. Payee Walker had previously lived at that address. A V.A. check payable to Walker had been sent to the Tyson address by mistake. Parks had taken the check to a local grocery store, stood before a Dubl-Check camera, endorsed the check with the name Herman E. Walker, given his address and received the $136.

■ The defense was insanity and the strategy was well developed by court-appointed counsel. The defense would first show, and then the prosecution would have to negate beyond a reasonable doubt,[1] that at the time Parks committed the offense in question he was [i] by reason of mental disease or illness either [ii] unable to appreciate the wrongfulness of his actions or [iii] unable to conform his conduct to the requirements of the law. See, Blake v.

United States, 5 Cir. (en banc), 1969, 407 F.2d 908.[2]

To open its case, the defense presented the deposition of Dr. Glen, a psychiatrist and professor of psychiatry from Dallas, who had treated the defendant when he had been committed to a mental institution after an adjudication of incompetency in 1961—eight years before the asserted crime. Dr. Glen testified that Parks was then suffering from "chronic paranoid schizophrenia," a psychosis in which the person has "lost their ability to measure reality. * * * To put it in layman's language, he was crazy." Parks' schizophrenia was the "worst type to have, a continuous type that there is no real successful treatment of this kind of illness." It would be "very surprising" if Parks could have been recovered from this illness in 1969. More importantly, though Parks was released from the mental institution in 1962, Dr. Glen warned[3] that periods of marked stress would trigger a recurrence of the psychotic syndrome and that Parks would again be unable to conform his conduct to reality. (TR 135–37).

Thereafter, defense counsel, posited to the doctor—as a hypothetical—the facts

1. "The sanity of the accused is always an element of the offense charged; and the .presumption of sanity, standing in the place of evidence when no question is raised about the issue, takes care of the prosecution's burden of proving sanity. But when evidence of insanity is received, regardless of the source, that presumption disappears, and the prosecution has the burden of proving the mental capacity of the accused beyond a reasonable doubt."
Mims v. United States, 5 Cir., 1967, 375 F.2d 135, 140.

2. "We adopt the following standard as a definition for use in defining insanity in this circuit where the defense of insanity is in issue:
'(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

'(2) As used in this Article, the terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct."
Blake, supra, 407 F.2d at 916.

3. "Q. In Mr. Parks' case, if you will, assume a period of marked stress in his environment. Do you have an opinion which you could express with reasonable medical certainty, based on your background and training as well as your treatment and examination of this man, whether he would be—whether he would have the capacity to conform his conduct to the requirements of law?
"A. There is a real danger that he would not. There is not an absolute certainty. But if I was asked ahead of time, you know, should this man be helped during this phase, I would say very definitely, yes, because he would be running a very high risk of not being able to handle reality." (TR. 136–37).

and circumstances later proved by lay witnesses producing a period of tremendous stress for the defendant and asked whether that stress would be sufficient to precipitate a psychotic episode. The psychiatrist answered that it would.

At this point the defense had established that Parks was suffering from mental disease which, if triggered by periods of marked stress, would manifest itself in the patient's inability to conform his conduct to the requirements of the law. Next, five lay witnesses testified about the tremendous stress—the existence of which was of critical significance to Dr. Glen's conclusions—to which defendant had been subjected just prior to the forgery episode. Parks' 16-year-old stepson had suffered a brain hemorrhage and the doctors had informed the Parks that a second hemorrhage was inevitable and would be fatal. The child sustained brain damage as a result of the hemorrhage and suddenly forgot how to read and write. As a result, the wife suffered a nervous breakdown and was committed to a mental institution. Upon her release, she became an alcoholic and, by her own confession, began conducting herself in something less than faithful fashion. Parks was forced to look after the children, and serve as both a mother and father to them. Meanwhile, one child ran away from home and another in the military was ordered to Viet Nam.

As Dr. Glen had warned to expect, physical manifestations of the schizophrenic syndrome he had described began to appear and were noticed by neighbors. The witnesses testified that Parks was usually a happy-go-lucky life-of-the-party type of person. (TR 180). He became withdrawn and introverted. He would no longer respond even to a friendly "Hello." (TR 199). He would spend hours at a time sitting in a tree house he had built for the children "just talking to himself." (TR 165). He became a religious fanatic, condemning everything anybody did. (TR 213). He did strange things completely out of character. (TR 206–07). He began to show signs of "pathological jealousy" and once exploded, striking his wife and breaking her jaw. (TR 210). In the words of a neighbor, "He just flipped completely." (TR 208). The neighbor continued, "He got withdrawn, and then he got bad tempered and quick and irritable, and then he started going off in a world of his own all the time." (TR 205–06). "He just wasn't the same person." (TR 204).

The symptoms of schizophrenia described by the doctor, which could be expected to be triggered by periods of great stress, had, *as Dr. Glen had predicted,* apparently begun to manifest themselves.

But the defense did not stop there. A second psychiatrist, Dr. Hardin, was called, this one court-appointed. Dr. Hardin had examined the defendant after the "crime" and his conclusion was unequivocal—"In my opinion, in and about February of 1969 when he committed this offense, I must, by a process of inference, be of the opinion that he was * * * not able by reason of mental disorder and disease to conform his conduct to the law." [4]

That Parks had established a strong case suggesting legal insanity could not seriously be disputed, and it was certainly enough to put a heavy burden on the Government to establish sanity beyond a reasonable doubt.[5]

The Government obviously realized this for at this point it presented

---

4. This was a paraphrase of the *Blake, supra,* standard followed in this Circuit —except, of course, that the disjunctive element [ii] (see text, *supra*) was concededly not present.

5. "The nature and quantum of rebuttal evidence sufficient to present a jury question is to some degree determined by the strength of the case for insanity." Brock v. United States, 5 Cir., 1967, 387 F.2d 254, 258; Nagell v. United States, 5 Cir., 1968, 392 F.2d 934, 937. See also, *Mims, supra.*

its rebuttal testimony. The Government had not been satisfied with Dr. Hardin's conclusions so it had requested that Parks be ordered to present himself for psychiatric examination by a doctor of its choosing. It is the testimony of this third psychiatrist, Dr. Coffer, which, the Government argues, created the jury question on sanity. For, the Government urges, if this testimony were believed and the testimony of the defense psychiatrists and lay witnesses were not credited, its theory that Parks was, as Judge Ingraham so aptly characterized the theory from the bench during oral argument, "temporarily sane" [6] at the time he committed the offense, would be established. On close reading, however, we are convinced that Dr. Coffer's testimony only reinforced the defense claim that Parks was, by reason of mental illness or disease, unable to conform his conduct to the requirements of the law. At all events, as will be shown, this particular testimony standing alone could not support a finding of sanity beyond a reasonable doubt, particularly since the witness never expressed an opinion as to element [iii] of *Blake*, either in express words or in terms which fairly convey that standard.

The portions of Dr. Coffer's testimony relied on by the Government relate to element [i] of *Blake*—the mental illness or disease issue. Indeed, Dr. Coffer did express the conclusory opinion that "there was no evidence of any actual mental illness from the present examination, and no indication of any residuals of mental illness in the past, and *from the history which I obtained* surrounding the events in question,[7] I did not feel within bounds of reasonable medical certainty that he was actually mentally ill in March, 1969." (TR 222, emphasis added).

If this assertion can be credited beyond a reasonable doubt, then Parks would fail in his attack. For mental illness is the indispensible element [i] of *Blake*. Without it, neither [ii] nor [iii] come into play and the conclusory opinions of Drs. Glen and Hardin on element [iii] would be legally insignificant.

The problem is that Dr. Coffer's medical conclusion was clearly predicated upon a very important [8] factual assumption which was manifestly incorrect—"I felt that there was nothing to suggest from the findings that I had obtained, or the history, that he had experienced any brain psychotic episode or mental illness in the past." (TR 223). The error of that underlying fundamental factual assumption is indisputably clear. In 1961 Parks was *adjudicated* incompetent "by reason of underlying schizophrenic reaction" (described in the in-

---

6. The Government's theory is that, even conceding that Parks suffered from "intermittent mental illness," he was "not experiencing a psychotic episode" at the time of forging and negotiating the check in question. In its brief, the Government describes the defendant as "mightily upset, somewhat confused in his thinking, feeling extremely insecure —or even desperate * * * an odd person, a recluse of sorts, an eccentric, a fanatic, a tragic figure * * * [whose] conduct may have been childish or weird or even brutal upon provocation * * *."

At oral argument, Judge Ingraham aptly characterized the Government's position from the bench as "a theory of temporary sanity."

7. Unlike the defense psychiatrists, Dr. Coffer did not have the benefit of Parks'

past medical records. As we point out later, his one hour interview did not reveal many relevant aspects of Parks' medical history.

8. Dr. Hardin provided additional expert testimony on the great significance of past mental illness.

"Q. Now, Doctor, if I can go back a minute, is there any relevance, as far as you are concerned, in determining whether or not this man had ever had an acute schizophrenic episode in the past?

A. Yes.

Q. —Even back as far as 1961. Would that have any relevance at all to his condition at about March 1, 1969?

A. Very much relevance. Unfortunately, schizophrenia, once it occurs in a person's life, tends to be recurrent." (TR 262).

competency order as "chronic") by the County Court for Alachua County, Florida, and committed to the Macclenny State Hospital.[9] Moreover, the uncontradicted testimony was that Parks had attempted suicide on at least two occasions,[10] and the incompetency order recited "suicidal thoughts" as one of his propensities. The fact that Dr. Coffer's one hour interview with Parks 19 months after the offense had not developed these and other vital facts, cannot refute the live and documentary evidence that Parks was indisputably mentally ill at some point in the past.

In addition to the above, several other facts which were conceded by Dr. Coffer to be very significant to an opinion on mental illness apparently were undiscovered or unrevealed during the interview. For example, Dr. Coffer was evidently unaware of Parks' religious fanaticism, although he testified that "if a person becomes a religious fanatic, in a sense losing some reality orientation as to their own importance, then it would be an indication of illness." (TR 239). The Government concedes the uncontradicted fact that Parks' religious fervor was fanatical. See footnote 6, *supra*. (See also testimony of June Benson, TR 204, 206–07, 212, 213).[11]

Similarly, although he clearly explained that pathological jealousy "is certainly an indication of * * * either * * * neurosis or mental illness," (TR 240), Dr. Coffer testified that he had no knowledge that Parks had once struck his wife in a jealous rage breaking her jaw. (TR 241). (See TR 210). Additionally, while testifying that Parks' wife's infidelity would have "upset [Parks] terribly" (TR 243), Dr. Coffer indicated that he mistakenly thought that the situation had occurred in a previous marriage. He did not realize that it had happened about the time of the offense in question.[12]

Importantly, every conclusion expressed by Dr. Coffer was specifically made on the basis of the erroneous underlying fundamental assumption of no mental illness in the past. For example, in response to a question about element [ii] of *Blake*, Dr. Coffer answered, "I found no evidence or indication or suggestion of mental illness. *Therefore*, I would presume that such an act undertaken by Mr. Parks was at least done so with a realization of the wrongness of the act, and also with the realization of the punishment." (TR 233, emphasis added). See also TR 222, quoted above.

At another point, after explaining that Parks was "emotionally very upset at the time of this offense," Dr. Coffer continued, "But, in my opinion, there was no indication of an actual mental illness or brain psychotic episode. *So* I concluded that I felt that he was mentally competent from a medical standpoint, and also competent within the bounds of reasonable medical certainty in March, 1969. And I am sure you would take into consideration that I did not see him at that time and this is retrospective,

9. Dr. Coffer thought that Parks had voluntarily committed himself to the Hospital sometime prior to 1960 but that he was shortly (a few weeks) found competent and discharged.

In point of fact, Parks had been adjudicated incompetent in December 1961 and was committed for several months.

10. Dr. Coffer did not mention the suicide attempts in his official report.

11. For example,
"Q. Have you known other people who have tried to 'convert' you religiously?
A. Oh, no, not to that point. I mean, I couldn't open my mouth that he wasn't

condemning me for something." (TR 213).

12. We do not here judge the credibility of the Government's witness, for that is exclusively a question for the jury. But the facts of this case clearly demonstrate the Solomonic wisdom of the oft quoted maxim that "expert opinion as to insanity rises no higher than the reasons upon which it is based." Nagell v. United States, *supra*, 392 F.2d at 936; Mims v. United States, 5 Cir., 1967, 375 F.2d 135, 143; Breland v. United States, 5 Cir., 1967, 372 F.2d 629, 633.

*based upon* my present examination and *a review of his history.*" (TR 227, emphasis added). Again, the erroneous underlying assumption (no past mental illness) tainted the conclusion of "competency."

What Dr. Coffer's testimony did provide was a description of the dynamics of mental illness [13] which provides great illumination for resolving this case. For, as we now demonstrate, when that definition is juxtaposed upon the factual testimony of the lay and expert witnesses, at least that one crucial element of the insanity defense, mental illness, is firmly established. The interplay between Dr. Coffer's definition and relevant testimonial excerpts from him and other witnesses is revealing.

"A person that is mentally ill is markedly impaired in areas. They have a tremendous amount of inner pressure and conflict * * *

(Dr. Coffer): [14] "In early 1969 he was under a great deal of emotional stress and pressure * * *." (TR 226) "He has been very happy in his present marriage of five years, though they have certainly had tremendous stresses and pressures * * *." (TR 226). "I think he was under a great deal of external situational stress, yes." (TR 247).

" * * * which has sort of overwhelmed the ego * * *

(Dr. Coffer): "I feel that he was emotionally very upset at the time of this offense, and essentially experienced what I might call a reactive anxiety condition." (TR 227).

" * * * or the conscious awareness.

(Mr. Van Eepoel): [15] "Well, I know I would speak to him and say, 'Hello, Harry, how are you,' and didn't even get a word out of him, like his mind was a million miles away or wasn't even paying attention." (TR 199).

" * * * They misinterpret a lot of things, * * *

(June Benson): [16] "Like, for example, I raise dogs and you refer to a female dog as a bitch. Well, Harry had bought a dog and he knew all this, and then one day I mentioned the word and he started into me for using this sort of language. So he acted like that, and it was just completely you know, way out." (TR 212-13).

" * * * they are sporadic in their actions, * * *

"(June Benson): "He could sit and read his books and talk to himself, and he didn't have to, you know, really understand what was going on around him. And then other times he would be—I would go over there and he would be his good old self and everything would be marvelous." (TR 213). "He would change a lot. * * * And then other times you would go over and he would be just his plain old self, and he wouldn't have any connection with the way he had acted the times before." (TR 204).

" * * * they may actually develop fixed delusions of persecution, for example, * * *

(Helen Parks): [17] "He had tried suicide on two other occasions." (TR 166). "He told me that—that we were the first family that he had ever

---

13. In this description and explanation of the origin, development and manifestations of mental disease lies the main usefulness of expert psychiatric testimony. Nagell v. United States, 5 Cir., 1968, 392 F.2d 934, 937; Fitts v. United States, 10 Cir., 1960, 284 F.2d 108, 113; Carter v. United States, 1956, 102 U.S. App.D.C. 227, 252 F.2d 608, 617. Dr. Coffer, the Government psychiatrist, performed this function ideally.

14. Dr. Coffer is a court-appointed psychiatrist who testified for the Government by way of rebuttal.

15. Mr. Van Eepoel was a neighbor of the Parks.

16. June Benson was a neighbor of the Parks.

17. Helen Parks is the defendant's wife.

cared about, he was afraid that we were all just going to go separate ways, and the family was going to break up and he was going to lose us." (TR 165–66).

"* * * and react to their own distorted ideas and irrational ideas rather than to the realities of the situation.

"(June Benson, after testifying that Parks was a good father and a good husband generally and that he would "do anything" for his family): "At one time they were very, very hard up for money—I mean, they were right down to the beans, that sort of thing * * * well, Harry got paid for a job, he had done a little job for somebody and what did he do? He came home with the money and he went out and bought a book—like it was a religious book. He was quite happy in his little world, reading his religious book, and Helen—I mean she was ready to pull her hair out. She came over to me crying her eyes out, you know, because they needed money and there is Harry in his own little world, just pleased as punch, reading his book." (TR 206–07).

"* * * They are sometimes able to formulate a course of action and stick to it with a great deal of perseverance, but frequently this is based upon illogical contentions to begin with, such as paranoid delusions and ideas. [See discussion, *infra*.] But usually they are not able to fully understand and interpret reality situations, * * *

(June Benson): "And it was things like this he couldn't seem to grasp, you know, realism and stuff. He would just kind of go off, and she would come up to me and say, 'Listen.' And he would be in the other room just mumbling away to himself, happy as a lark, without realizing what was going on." (TR 207).

"* * * so that their behavior is disturbed * * *

(Helen Parks): "Well, he [kept] talking to himself, and saying that life wasn't worth living. And this frightened me because he had tried suicide on two other occasions when we were first married." (TR 166).

"* * * and bizarre * * *

(Sherry Lehner): [18] "He didn't act himself at all. We had a fort that he had built us out in the backyard, it was like a tower, and he would go up there and sit for just hours talking to himself." (TR 180).

"* * * and illogical."

(June Benson): "Sometimes I would go over there and just out of the blue he would start on me, and he started telling me what I should say and what I shouldn't say, and that I was a sinner for doing this." (TR 212). "I mean, I couldn't open my mouth that he wasn't condemning me for something." (TR 213).

Thus, using Dr. Coffer's definition of mental illness and the undisputed, uncontradicted testimony of all witnesses, the conclusion is virtually inescapable that Parks suffered from mental illness at the time in question, or as a minimum, that it is against the manifest weight of the evidence to conclude that the Government established beyond a reasonable doubt that he did *not* have a mental illness.

But the inquiry does not end here, for Dr. Coffer very positively testified that Parks knew the difference between right and wrong at the time he committed the offense. (TR 234). This, of course, was a verbalization of the *McNaghten's* rule [19] which became *disjunctive* element [ii] of *Blake*. Were this the standard upon which the defense psychiatrists concluded that Parks was not "sane," we would have to accept the implicit jury verdict. But Drs. Glen and Hardin never suggested the presence of element [ii]. To the contrary, they readily admitted that on the old *McNaghten* test

---

18. Sherry Lehner is the defendant's adopted stepdaughter.

19. McNaghten's Rule, 1843, 10 Cl. and F. 200, 210, 8 Eng.Rep. 718, 722.

Parks would be found legally accountable.[20]

Even in pre-*Blake* days, however, this Court recognized that the right and wrong (cognition) test was not the only determinant of insanity. Since at least Howard v. United States, 5 Cir., 1956, 232 F.2d 274, this Court has recognized that the cognition test must be considered with a *disjunctive* (i. e., either/or) so-called "irresistible impulse"[21] standard.

And this is what the defense psychiatrists stressed—that on account of mental illness, Parks was unable to conform his conduct to the law.

Thus, once mental illness was established, or at least, not discounted beyond a reasonable doubt, it was not enough for the Government simply to refute element [ii], on which there was never any contest anyway. Rather, the Government had to meet and overcome the defense evidence on element [iii] and show that Parks was able to conform his conduct to the requirements of the law beyond a reasonable doubt. But this burden it never even sought to discharge and the defense evidence on [iii] is *uncontradicted* in the record. Without any evidence on the issue (element [iii]) for the Government, there was nothing to go to the jury on that point ([iii]).

In this sense, the case is most unusual. But it is that extraordinary setting which eliminates any apprehension that our decision here weakens or modifies in any way the standard previously announced—the main thrust of which is that it is ordinarily for the jury, not the trial or appellate court, to determine a sanity issue.

We do not mean to expound here a literalism too restrictive for common sense, but, on the other hand, to read more into the medical opinion than expressed is an equally dangerous approach. Here the psychiatrist never testified in so many words or in any variation conveying substantially the same meaning that Parks was able to conform his conduct to the requirements of the law—and that is what the Government had to show.

So the experts had testified that periods of marked stress would produce a manifestation of the schizophrenic syndrome characterized by an inability to respond to reality—that is, to conform conduct to the requirements of a perceived reality. Lay witnesses and even the Government's psychiatrist had testified to the tremendous stress and pressure to which Parks had been subjected just prior to the offense. That Parks had again lost contact with reality—*as had been predicted by Dr. Glen*—the symptoms of which were noticed by lay witnesses who described his "disturbed and bizarre and illogical" (TR 288) conduct, was confirmed by the experts.

■ The expert testimony and the lay witness evidence left the Government with only one last contention—that the circumstances of the "crime" were enough to show sanity beyond a reasonable doubt. To support this theory, the Government points out that Parks went to a grocery store on the other side of town to forge and pass the check, thereby evidencing rationality demonstrating sanity. But in the face of the overwhelming expert witness evidence reinforced by the lay witness testimony, this simply was not enough to prove sanity

20. For example, in the same sentence in which he asserted that Parks was unable to conform his conduct to the law, Dr. Hardin explained that he was "probably able to distinguish correctly the wrongfulness of his act." (TR. 267).

21. ["Irresistible impulse] is perhaps a misnomer because it includes acts resulting from .premeditation as well as

from sudden impulse, but it is applicable when one understands the nature and consequences of his act and appreciates the wrongness of the act, but, in consequence of a mental abnormality, is forced to its execution by an impulse which he is powerless to control." Carter v. United States, 5 Cir., 1963, 325 F.2d 697, 705.

beyond a reasonable doubt, particularly when the simple check cashing evidence is considered in the light of the rest of the events. Parks stood right before a camera—which he knew was photographing him and the forged check—signed the forged name, and the address at which he was residing and to which the check had been sent. He then returned to that address and continued to live there for about a year. The Government's psychiatrist testified that Parks was a college graduate, "a very bright person, intellectually superior." (TR 224). There is simply no basis on which the jury could conclude beyond a reasonable doubt, in light of all the other evidence, that such a bright person—if sane—would knowingly leave his photograph and address when committing a criminal act—virtually leave a calling card telling the authorities where to find him when they inevitably got around to it.

When the act itself is considered with all the other testimony and evidence in the case, the conclusion of insanity becomes manifestly clear, or at least, it becomes singularly apparent that a pronouncement that the Government proved sanity beyond a reasonable doubt would be manifestly contrary to the overwhelming weight of the evidence.

Nor is this ultimate conclusion any less certain because, as the Trial Court suggested, "We have a [Dubl-Check] picture of him signing this check. And to the jury he may look like he is doing all right." The test in this Circuit has never been whether or not the defendant *looks* sane from outward appearances, and this record certainly offers no justification for departing from that rule.

■ What we do here, of course, has ample precedent in our prior decisions. Necessarily, every insanity case must deal with its own peculiar facts. But what is revealed here in fact and result is mandated by analagous facts in *Nagell, supra.* See also, United States v.

Collier, 5 Cir., 1972, 453 F.2d 1173. In *Nagell*, for example, as in the case at bar, the testimony of the Government expert medical witnesses was contrary to that of the defendant's medical experts.[22] Of course, as in *Nagell*, "we do not resolve this 'battle by psychiatrist' quantitively." *Nagell, supra,* 392 F.2d at 934. Rather, we analyze the expert testimony carefully to ascertain if it might be reconcilable. In this pursuit, the adequacy of the factual assumptions on which the opinions are based must be weighed, but with due reverence to the jury's credibility choice prerogative. Finally, we look to the act itself to see if the peculiar circumstances of the case suggest a particular conclusion.

In *Nagell* the Court noted the peculiar facts surrounding Nagell's attempted bank robbery. He had demanded travelers' checks, not cash. He had asked for a specific and relatively small amount ($100). "He said, 'this is a real gun', not 'this is a stickup'. He fired two shots into the wall not at anyone and for no apparent reason. *And he was not at all evasive* when he left the bank." *Nagell, supra,* 392 F.2d at 938. (Emphasis added). This evidence of insanity, coming as it did from the act itself, was highly important to the Court in *Nagell*. On the basis of the record before us, we can perceive no basis for distinction between *Nagell* and the case at bar.

■ Viewing the totality of the evidence, when analyzed critically as we have done, it is almost "clear to us that upon the evidence * * * a reasonable mind must necessarily have had a reasonable doubt as to * * * guilt." *Nagell, supra,* 392 F.2d 934; Hopkins v. United States, 1960, 107 U.S.App.D.C. 126, 275 F.2d 155, 157 n. 2. But we need not reach that pinnacle of absolute certainty, for the defendant has requested a new trial based on a manifest weight of the evidence theory. Although the evidence here (or lack of it) might be such as to otherwise require a

22. In *Nagell* three psychiatrists and two clinical psychologists testified for the

defendant, while two psychiatrists testified for the Government.

directed verdict of acquittal, F.R.Crim. P. 29, that fact does not rule out the appropriateness of a new trial where the defendant has requested one and the interests of justice are best served thereby. United States v. Musquiz, 5 Cir., 1971, 445 F.2d 963; Bryan v. United States, 1950, 338 U.S. 552, 70 S.Ct. 317, 94 L.Ed. 335. Although it has not yet done so, it is entirely possible that the Government might be able to present sufficient evidence of the defendant's sanity to create a jury question and support a jury finding. Under the circumstances, the "interests of justice", 28 U.S.C.A. § 2106, call for reversal and remand for a new trial. *Bryan, supra.*

Reversed and remanded.