UNITED STATES of America,
Plaintiff-Appellee,

v.

Robert WESTERHAUSEN, Jr.,
Defendant-Appellant.

No. 12908.

United States Court of Appeals
Seventh Circuit.

Nov. 18, 1960.

Rehearing Denied Dec. 9, 1960.

Melvin B. Lewis, Frank W. Oliver, Chicago, Ill., for appellant.

Robert Tieken, U. S. Atty., Charles R. Purcell, Jr., Asst. U. S. Atty., Chicago, Ill., John Peter Lulinski, Burton Berkley, D. Arthur Connelly, Asst. U. S. Attys., Chicago, Ill., of counsel, for appellee.

Before HASTINGS, Chief Judge, CASTLE, Circuit Judge, and MERCER, District Judge.

HASTINGS, Chief Judge.

This is an appeal by defendant Robert Westerhausen from a judgment of conviction of armed robbery of a federally-insured bank. The September, 1952 grand jury indicted appellant and three others, charging them with armed robbery on August 1, 1952, of a federally-insured bank in Lyons, Illinois, in violation of 18 U.S.C.A. § 2113. One of the co-defendants was tried and convicted in December, 1952; the other two, in March, 1953. Appellant's trial commenced November 4, 1959 after the trial court refused to suppress appellant's confession; on November 16, 1959, he was found guilty by a jury and was sentenced to imprisonment for a period of fifteen years.

Appellant's defense centered on his alleged insanity *on August 1, 1952, the day of the robbery*. Appellant here does not question that the evidence shows he participated in the robbery of a federally-insured bank, but he reaffirms his contention that the Government failed to discharge its burden to introduce sufficient evidence to establish his sanity at the time of the offense and that the trial court erred in denying his motion for acquittal. Additional issues raised need not be considered here in the light of our determination of this appeal.

Because our disposition of the case turns on the issue of appellant's capacity to form the requisite *mens rea* on August 1, 1952, a chronological history of appellant's mental condition from 1950 to 1959, drawn from the record, becomes necessary even at the risk of unduly prolonging this opinion.

In preface, at the trial both appellant and the Government offered expert and lay witnesses to testify relative to appellant's sanity. The Government offered one expert, Dr. Haines; three FBI agents, Stefanak, Spencer, and DuMaine; and a psychiatric social worker at the Illinois Security Hospital, Zeidler. Appellant called his sister-in-law as a lay witness and six medical expert witnesses, Doctors Hoffman, Hanni, Skorodin, Kruglik, Groves Smith, and Charles E. Smith. In addition, the testimony of Dr. Dowell before the DuPage County (Illinois) Circuit Court was read to the jury. Appellant did not testify.

### 1936–1950

During this period, appellant, who was born in 1920, was placed in various mental, correctional, and penal institutions, commencing at the time he was 9 or 10 years of age. Dr. Hoffman, a defense expert, testified appellant failed to make an adjustment in any institution in which he was placed. While incarcerated, he attempted suicide two or three times.

### 1950–1951

In 1950, appellant, then an inmate of the Illinois State Penitentiary, was examined by defense witness, Dr. Meyer Kruglik, an expert in psychiatry. Dr. Kruglik testified that after appellant had made an attempt at suicide, he was asked to evaluate appellant's mental condition. His diagnosis was that appellant should be detained in a special ward for further observation of possible mental illness and not returned to the general population of inmates.

In June, 1950, appellant was examined by defense witness, Dr. Groves B. Smith, a psychiatric expert, incident to appellant's transfer from the Statesville Unit of the penitentiary to the Psychiatric Division. Dr. Smith assumed supervision of appellant's care and treatment during

the time he was in the latter institution. His examinations commenced in June, 1950 and continued until March 5, 1952, at which time appellant was released from the custody of the State of Illinois because of the expiration of his prison sentence.

The June, 1950 examination by Dr. Smith included a complete review of appellant's history from his admission into the Illinois correctional system in 1936. Dr. Smith concluded that appellant was then suffering "from an acute schizophrenic disassociation with a background of depression"; that he was mentally ill; that "in ordinary legal terminology * * * he was suffering from an active psychosis in which there had been an emotional block in his thinking"; and that he was not then capable of distinguishing and making a deliberate and intelligent choice between right and wrong.

In October, 1950, after treatment and because of his improvement, Dr. Smith reclassified appellant "as a phychosis in remission." Appellant at that time no longer disclosed the active behavior that characterized the earlier diagnosis. At this time, appellant was retained in the Psychiatric Division for further evaluation of his adjustment.

Later, appellant was returned to the General Division. However, after a period of several months, he was again sent back to the Psychiatric Division where he remained until December, 1951.

### 1952

Appellant was then transferred back to activity within the Menard General Division. In January, 1952, Dr. Groves Smith wrote a release report stating that appellant was no longer actively psychotic, but that he was a psychosis in remission. At this time Dr. Smith testified that appellant had made a satisfactory adjustment on an institutional level, but there was no indication he had recovered in the ordinary sense. It was "extremely problematical" whether appellant could make a satisfactory readjustment outside of an institution of any sort. Nevertheless, Dr. Smith made the recommendation that appellant be given consideration for release at the expiration of his sentence. In this recommendation he was "primarily" influenced by the fact that on his discharge from Menard, appellant was going to be released to the Cook County (Illinois) authorities. Had appellant not been released to those authorities, Dr. Smith stated he would have suggested that prior to discharge a hearing be held under the Illinois Mental Health Code, S.H.A. ch. 91½, § 1–1 et seq., to determine whether appellant was a person, although not mentally ill, nevertheless was in need of medical treatment so that his release back to the community could be accomplished in a supervised manner.

On March 5, 1952, appellant was discharged from Menard; he was described then as being "without psychosis." Dr. Groves Smith testified that appellant could choose between right and wrong on a supervised level but did not have the ability to make independent interpretations in a free community. Dr. Smith indicated that an exposure to a stress situation at that time would cause a return of appellant's active schizophrenic pattern of behavior and that going into a free society would produce such a stress situation.

Upon his discharge, appellant was transferred to the custody of Cook County authorities. However, later in March, 1952, he was released from such custody on a legal technicality.

During the intervening period from April, 1952 to August 1, 1952, appellant lived with his sister-in-law and then with his father. Appellant called the sister-in-law as a lay witness to testify to his behavior. She testified that during this period defendant was insane and on August 1, 1952 was incapable of distinguishing right from wrong.

The Government expert, Dr. William H. Haines, testified at the trial in response to a hypothetical question containing many facts concerning appellant's illness that it was his opinion, based on a reasonable degree of medical certainty, that the hypothetical man was able to distinguish right from wrong and act on

that distinction on August 1, 1952, the day of the bank robbery.

Appellant was taken into custody shortly after the robbery. There was testimony that during this period he attempted to drive a nail through his wrist and palm. One expert testified to his seeing scars on appellant's left wrist. On August 19, 1952, appellant gave a detailed explanation and confession of the robbery to three agents of the Federal Bureau of Investigation, including Special Agent Stefanak. Agent Stefanak was called by the Government as a lay witness to testify to appellant's sanity. He recounted the August 19 meeting and conversations with appellant on August 27, September 8 and 20, 1952, at the DuPage County jail in Wheaton, Illinois. The conversation of the 27th had to do with appellant's conduct subsequent to the robbery. That of the 8th had to do with the capture of one co-defendant. At that time, in addition, appellant told Stefanak that he planned to fake insanity in state court proceedings; and if he was able to do that, upon his being turned over to the Government after two or three years and serving a sentence for bank robbery, he felt he would be free of any state court obligation. The conversation of September 20 had to do with the conduct of co-defendants relative to their capture.

Agent Stefanak testified that on each of the above occasions, it was his lay observation that appellant could differentiate between right and wrong and act on that differentiation.

On October 23, 1952, pursuant to an order of the DuPage County Circuit Court, Dr. Raymond Dowell and Dr. Harry Hoffman examined appellant to determine whether appellant at that time had the requisite mental capacity to stand trial in the state court. Dr. Hoffman, defense expert, testified that after examination he found a condition of paranoid schizophrenia in appellant and that he was "insane" within the terms of the Illinois statute so that he could not stand trial. Dr. Hoffman stated appellant then knew the nature of the charges against him but was unable to cooperate fully with counsel. It was his opinion that appellant was not malingering. Dr. Hoffman gave no opinion as to how long the condition he found in appellant had persisted. His October, 1952 report did not contain such a diagnosis because the state's attorney did not request that information.

Dr. Dowell, who examined appellant with Dr. Hoffman on October 23, 1952, was absent at the time of trial. His testimony before the DuPage County court on October 31, 1952, relative to his examination was read to the jury. Dr. Dowell had stated that appellant was "insane," was suffering from a psychopathic personality and that superimposed thereon was a psychosis known as schizophrenia. It was his opinion that appellant was unable to cooperate with counsel or understand the significance of the offense with which he was then charged *in the state court*.

On October 31, 1952, appellant was adjudged insane by a jury in a proceeding in the Circuit Court of DuPage County, Illinois. Thereupon, on November 1, 1952, appellant was admitted to the Illinois Security Hospital, Menard, Illinois, where he was in custody intermittently until his ultimate discharge in November, 1958. This custody was interrupted on at least five occasions—on June 16, 1954, July 26, 1955, August 17, 1956, April 12, 1958, and on his final release, November 8, 1958. After each discharge except the last, appellant was remanded to such hospital within a four month period. The 1954 and 1956 discharges were on the recommendation of the Department of Public Welfare that appellant be returned to DuPage County to stand trial. The 1955 and 1958 discharges were pursuant to a writ of habeas corpus in proceedings in Randolph County, Illinois, in which appellant was attempting to establish his sanity. In each release pursuant to a writ of habeas corpus except the last, appellant was declared sane in a proceeding in Randolph County, then transferred to DuPage County where he was found insane and returned to the hospital. The 1954 and 1956 releases resulted in determina-

tions in DuPage County that appellant continued insane within the terms of his commitment, and he was returned to the hospital.

Zeidler testified for the Government as to his association with appellant during the six-year period of the latter's confinement at the Menard Security Hospital. Zeidler stated that he was a psychiatric social worker; that he had talked with and observed appellant a number of times; that he had been present at several psychiatric examinations of appellant in the hospital; and that he had accompanied appellant on three trips to the DuPage County court. He stated it was his lay opinion that during his acquaintance with appellant, the latter was "sane" to the degree that he could cooperate with counsel and that he was able to differentiate between right and wrong.

On November 6 or 7, 1952, Special Agents Stefanak and Spencer had a conversation with appellant at which time appellant again discussed his preparations for the robbery of August 1 and gave agents certain leads as to a co-defendant and additional witnesses. Both agents testified that it was their lay opinion that appellant was able then to differentiate between right and wrong.

On November 20, 1952, the Government filed a petition for a writ of habeas corpus *ad prosequendum* directed against the Superintendent of the Hospital for the purpose of bringing appellant to trial in federal court for bank robbery. Because of his earlier state adjudication of insanity, the district court on November 25, 1952 ordered that appellant be committed to an institution for an examination as to his mental condition to determine his competency to stand trial. This action was taken pursuant to 18 U.S.C.A. § 4244.

Appellant was committed to the Medical Center for Federal Prisoners, Springfield, Missouri, on November 30, 1952 and was returned to the custody of the Superintendent of the Illinois Security Hospital on December 18, 1952.

Dr. Charles E. Smith, presently Assistant Medical Director and Chief Psychiatrist of the Federal Bureau of Prisons, was called as a defense expert to testify to appellant's examination at the Medical Center in Springfield. Dr. Smith was the Chief of the Psychiatric Service at that hospital when he examined appellant on or about December 2, 1952. His conclusions were that appellant was not then competent to testify as a witness in the trial of one of his co-defendants. Further Dr. Smith found appellant not competent to stand trial, stating appellant was "legally insane by reason of a psychotic disorder which renders him incapable of differentiating right from wrong, unable to appreciate the nature and quality of the charges pending against him, and impairs his ability to cooperate with counsel."

Dr. Smith testified that appellant's examinations lasted several hours; they were physical, neurological, and psychiatric. He described in some detail the observed behavior and responses of appellant. They included loss of memory, auditory hallucinations, lack of spontaneous conversation, anger and hostility toward doctors, an insistence that he was sane, and paranoid delusions toward his family's opportunity to poison him. Appellant was confined at Springfield in the ward for the most acutely disturbed patients. He was under constant observation and surveillance by trained ward personnel. He was observed to be withdrawn consistently, tense, hostile, refused most of his meals, and spent most of his time huddled in a corner of his cell with a blanket over his head. Dr. Smith said he observed scars on appellant's wrists. He testified that he felt that appellant was not malingering, although prior to the examination rumors to that effect had come to him.

Dr. Smith concluded that appellant was then incapable of differentiating right from wrong.

Appellant's counsel put a series of hypothetical questions to Dr. Smith for the purpose of establishing his opinion of appellant's mental condition on August 1, 1952. These questions contained much of appellant's background and his-

tory. Dr. Smith answered he would conclude that on the day of the robbery the hypothetical man was "probably mentally ill," was suffering from a chronic schizophrenic disorder, and that there was some impairment of his volitional and cognitive faculties. But Dr. Smith said he was unable to give an opinion whether the hypothetical individual could distinguish between right and wrong on that date, because such opinion "would have to be determined on more specific information as to the degree of his illness at that particular moment." On cross-examination, Dr. Smith conceded that a diagnosis of schizophrenia is not necessarily equated with a legal state of incompetency.

### 1953

There is no direct testimony of appellant's activity in 1953. It is assumed from Zeidler's testimony that appellant was in custody during that time in the Illinois Security Hospital at Menard.

### 1954

On May 16, 1954, Dr. Haines, the Government expert, made the first of a series of examinations and observations of appellant. Dr. Haines was the Director of the Cook County Behavior Clinic and made these examinations as a consulting psychiatrist for the Illinois Security Hospital. His conclusion on each of these occasions was that appellant could distinguish between right and wrong at the time of observation, and this conclusion was the basis of appellant's several releases to the state court for further proceedings.

On June 16, 1954, appellant was discharged from the Illinois Security Hospital and returned to DuPage County.

In September, 1954, subsequent to appellant's return to the DuPage court and pursuant to an order of that court, Doctors Hoffman and Hanni jointly examined appellant to determine whether he was still insane under the terms of his commitment by the DuPage court on October 31, 1952. These two doctors were called by appellant as experts. Dr. Hoffman had examined appellant on October 23, 1952 pursuant to an earlier order of the DuPage County Court. He testified that in the 1954 examination he diagnosed appellant as then suffering from paranoid schizophrenia and was still insane under the terms of his earlier commitment.

Dr. Hanni also testified as to the September, 1954 examination of appellant. He stated appellant had no clear conception of his situation at that time, had delusional ideas and hallucinations that were persecutory and accompanied by a considerable amount of fear, and was anxious in the extreme. He found no evidence of appellant's feigning insanity; rather, appellant tried to impress Dr. Hanni with the fact that he was sane. Dr. Hanni concluded that appellant was suffering from schizophrenic reaction of the paranoid type, that he was mentally incompetent, and that for his own good and that of society, he should be retained in a mental institution. He was not able to determine how long appellant had been suffering from the conditions he found in September, 1954 but assumed they had been present for some time.

On September 29, 1954, appellant was again returned to the Illinois Security Hospital.

### 1955

On June 18, 1955, Dr. Haines made a second examination of appellant, finding a character disorder but ability to distinguish between right and wrong and act on that distinction.

Appellant was released from the hospital on July 19, 1955. At this time, appellant was attempting to prove his sanity in Randolph County, Illinois, upon his own petition for habeas corpus. He was then transferred back to the DuPage County officials.

Special Agent Stefanak testified to a conversation with appellant in the DuPage County jail on August 6, 1955. Appellant at that time said his faked insanity scheme had backfired and that since 1952 he had been on a circuit, traveling between the Randolph County court which would declare him sane and the DuPage County court which would declare him insane.

A third examination of appellant to determine whether he could stand trial took place in DuPage County on August 10, 1955 before Doctors Hanni and Bernard Skorodin. Appellant stood mute before Dr. Hanni, and he was unable to note any significant reactions or responses on appellant's part. Dr. Hanni was of the opinion that appellant's remaining mute was a continuing manifestation of the illness he discovered in his 1954 examination. Dr. Skorodin concurred that appellant was then suffering from a paranoid type of schizophrenic reaction which was chronic and that treatment would not help his condition. Dr. Skorodin did not form an opinion as to the specific period that appellant's condition had persisted, but said it had lasted "a long time."

On the next day, August 11, 1955, appellant was again interviewed by Special Agent Stefanak in the DuPage County jail at Wheaton, Illinois. Appellant told Stefanak that in all past examinations he had cooperated with the psychiatrists, but that in the examination the prior day he decided to remain mute; he felt that if he did this, the psychiatrists could not declare him insane. Agent Stefanak gave his lay opinion that at this time appellant could distinguish between right and wrong.

On October 8, 1955, appellant was remanded to the custody of the Illinois Security Hospital.

### 1956

Dr. Haines made his third examination of appellant on January 28, 1956. He found him "without active mental disease at the present time" and able to distinguish between right and wrong and act on the distinction.

On August 17, 1956, appellant, for a fourth time, was placed in the custody of DuPage County officials. In September, Dr. Skorodin made his second examination and concluded that appellant continued to suffer from a chronic schizophrenic reaction, paranoid type. Dr. Kruglik, who had briefly examined appellant in 1950, interviewed him at length this time. He concluded that appellant

was "psychotic, mentally ill" and suffering from a schizophrenic reaction of a mixed or undifferentiated type. He testified that appellant was unable to cooperate with counsel and at that particular time was unable to distinguish between right and wrong and act on that distinction. Further, he felt that appellant was not trying to mislead him. He answered that appellant's disease technically was chronic, but would make no estimate as to how long the condition had been present in appellant.

### 1957—March, 1958

Appellant was returned to the Illinois Security Hospital on October 1, 1956, where he remained in custody until April 12, 1958. During this period, Dr. Haines made three examinations—on April 14, 1957, and March 2 and 30, 1958. In each of these examinations, Dr. Haines classified appellant's condition as a character disorder with an ability to distinguish right from wrong.

Throughout the five year period, no action had been taken on appellant's case in federal district court.

### April—December, 1958

Pursuant to an order of the state court on April 3, appellant was discharged on April 12, 1958 to the custody of DuPage County officials. He was interviewed by Special Agent DuMaine in the DuPage County jail in Wheaton. Appellant discussed the bank robbery, indicated that he desired to come into federal custody and get the matter over with. He felt he was sane. He indicated his willingness to plead guilty and said he wanted his time to count for him rather than be spent on a bus ride between Chester and Wheaton, Illinois. Agent DuMaine testified he felt defendant on that date was able to distinguish between right and wrong and act on that distinction.

Appellant's next psychiatric examination came on May 6, 1958. Dr. Groves Smith, who had examined appellant from June, 1950 until March, 1952, conducted the examination, the fifth ordered by the DuPage County court. Dr. Smith reviewed appellant's history and inter-

viewed him personally. He found appellant then had a paranoid pattern of schizophrenia which he first exhibited in 1950. Appellant had been passing through reexacerbations of this condition from 1952 to 1958; although this condition was at times in partial remission, there was clear evidence from appellant's history that in 1954, 1956, and 1958 he had a return of his paranoia and schizophrenia. Dr. Smith found no evidence of malingering and testified that defendant was then unable to differentiate and choose between right and wrong. Appellant was remanded to custody of the Illinois Security Hospital on July 22, 1958.

On June 11, 1958, appellant moved in federal district court for the dismissal of his bank robbery charge on the ground that he had been deprived of a speedy trial and that his witnesses had become lost or unavailable. In the alternative, he moved for an immediate trial. Both motions were denied. These motions were renewed in federal district court on November 13, 1958 and were again denied.

Dr. Haines made his last examination of appellant on October 26, 1958 and found he had "paranoid ideations" but could distinguish right from wrong and act upon that distinction.

On October 30, 1958, appellant appeared in the Circuit Court of Randolph County, Illinois, was found sane, and was finally released from the Illinois Security Hospital on November 8, 1958 to the custody of the sheriff of DuPage County. No further hearings were held in DuPage County.

### 1959

Appellant was examined in January, 1959. Dr. Kruglik found, in an opinion given to the state's attorney of DuPage County, that appellant had undergone such marked improvement that he felt appellant was not then insane.

On January 26, 1959, appellant was taken into federal custody from the DuPage County jail. He entered a plea of not guilty to the bank robbery charge. On March 12, 1959, the Government moved for a psychiatric examination of appellant under 18 U.S.C.A. § 4244 to determine his competence to stand trial. The examination was made at the Federal Medical Center, Springfield, Missouri. The report of April 22, 1959 stated that appellant:

"* * * is suffering from long standing schizophrenia and that he is psychotic at the present time. However, it is our opinion that the patient at this time has undergone a partial recovery to a degree sufficient to enable him to understand the nature of the proceedings pending against him and to be able to assist counsel in his own defense."

This case does not involve the proper test for legal insanity. See, Voss v. United States, 8 Cir., 1958, 259 F.2d 699, 702–703; Andersen v. United States, 9 Cir., 1956, 237 F.2d 118, 126–128; Howard v. United States, 5 Cir., 1956, 232 F.2d 274, 275. Here, the jury was instructed under the traditional standards of the M'Naghten rules—that the defendant lacked mental capacity to form the requisite *mens rea* if, at the time of the commission of the crime, he was not able to distinguish right from wrong, act on that distinction or know the nature and the quality of his acts. Cf., the test of legal insanity in the District of Columbia, Durham v. United States, 1954, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430.

In this case there is no issue of who has the burden of persuading the jury. IX Wigmore, Evidence, §§ 2488, 2489, 2497 (3 ed. 1940). The instructions to the jury as to the burden of proof were correct. Cf., Davis v. United States, 1895, 160 U.S. 469, 478, 484, 16 S.Ct. 353, 40 L.Ed. 499, which reversed on an instruction that if the evidence of sanity balanced that of insanity, a verdict of guilty was justified. In the instructions in the instant case the burden of proving appellant's sanity *beyond a reasonable doubt* was properly placed upon the Government, just as it has the burden of proving all other elements of the crime. McKenzie v. United States, 10 Cir., 1959, 266

F.2d 524, 527. But cf., state practice described in Leland v. Oregon, 1952, 343 U.S. 790, 798, 72 S.Ct. 1002, 96 L.Ed. 1302.

The problem that faces us is to determine whether the trial court should have granted appellant's motion for acquittal. This motion raises the issue of the sufficiency of the evidence the Government introduced bearing on appellant's sanity.

■ In this case, the Government introduced *prima facie* evidence of appellant's guilt—his confession plus corroborating witnesses. At this point, there was a presumption of appellant's sanity. The burden of offering evidence as to his *insanity was then cast upon appellant*; for, if no evidence of insanity was produced, it was not proper to submit that issue to the jury.[1]

Here, on the contrary, appellant introduced *substantial evidence of his insanity*. The issue of his capacity to commit the robbery became a question of proof. Upon the conclusion of appellant's case, the Government readily concedes that the burden of going forward with the evidence shifted to the Government. This burden required the Government to introduce sufficient evidence on the issue of sanity to preclude a judgment of acquittal for defendant. See, IX Wigmore, Evidence, § 2487 (3 ed. 1940); 11 Nichols, Cyclopedia of Federal Procedure § 47.14 (3 ed. 1952). Dusky v. United States, 8 Cir., 1959, 271 F.2d 385, 397.

■ In criminal cases involving defendant's sanity, in order to remove a case from a jury's consideration, a court must conclude that on the basis of the evidence in the case before it, reasonable men must necessarily possess a reasonable doubt as to defendant's sanity and that reasonable men must conclude that the government has failed to sustain its burden of proving beyond a reasonable doubt that the accused had the capacity to commit the crime. Hopkins v. United States, 1959, 107 U.S.App.D.C. 126, 275 F.2d 155, 157; Wright v. United States, 1957, 102 U.S.App.D.C. 36, 250 F.2d 4, 7; Bradley v. United States, 1957, 102 U.S. App.D.C. 17, 249 F.2d 922, 924; Douglas v. United States, 1956, 99 U.S.App.D.C. 232, 239 F.2d 52.

The quantum and nature of proof the Government must offer to take the case to a jury varies in different situations and to some degree depends upon the quantum and nature of proof the defendant offers. Wright v. United States, 1957, 102 U.S.App.D.C. 36, 250 F.2d 4, 7.

■■ In considering the evidence of appellant's mental condition, it is to be noted that it was of four types—lay opinion as to appellant's sanity on the date of the crime; lay opinion as to appellant's *sanity on dates subsequent to the crime*; hypothetical questions posed to experts as to appellant's sanity on the date of the crime; and direct testimony by medical experts as to appellant's mental condition prior to and subsequent to the date of the crime. It is true, as the Government contends, that the legal standards for competence to stand trial and act as a witness are not the same as the legal standard of capacity to form the requisite *mens rea* in the commission of the crime. Although taken in a proceeding to determine capacity to stand trial or to act as a witness, that part of the medical expert's examination of appellant which dealt with his capacity to choose right from wrong is relevant to his legal sanity on the day of the robbery. Lyles v. United States, 1957, 103 U.S.App.D.C. 22, 254 F.2d 725, 729, certiorari denied 356 U.S. 961, 78 S.Ct. 997, 2 L.Ed.2d 1067.

The evidence of appellant's insanity here is substantial. Dr. Groves Smith

---

1. Wright v. United States, 1954, 94 U.S. App.D.C. 307, 215 F.2d 498; Smith v. United States, 1959, 106 U.S.App.D.C. 318, 272 F.2d 547; Holloway v. United States, 1945, 80 U.S.App.D.C. 3, 148 F. 2d 665, 666. Cf., "In all English-speaking courts, the accused is obliged to intro- duce proof if he would overcome the presumption of sanity." Leland v. Oregon, 1952, 343 U.S. 790, 799, 72 S.Ct. 1002, 1008, 96 L.Ed. 1302. See, Kregger v. Bannan, D.C.E.D.Mich.1959, 170 F.Supp. 845, 847.

testified that appellant had no capacity to choose right from wrong in a free society five months before the robbery. Dr. Charles Smith indicated he lacked that capacity four months subsequent. Lay opinion concurred on the date of the robbery. Appellant was adjudicated insane three months after the robbery and the DuPage County court later reaffirmed this judgment on four separate occasions. Dr. Kruglik testified appellant could not choose right from wrong in September, 1956; and Dr. Groves Smith reached the same conclusion in May, 1958. It is against this substantial testimony that we must determine whether the Government has offered sufficient evidence to take the case to the jury.

Dr. Haines concluded that appellant could distinguish right from wrong on the basis of a series of personal examinations starting in May, 1954. FBI agents gave lay opinions of sanity as a result of several conversations with appellant, starting on August 19, 1952, and continuing through November, 1952, also including conversations in 1955 and 1958. Zeidler concurred in his lay opinion based upon appellant's extended confinement in the Illinois Security Hospital. Finally, Dr. Haines was asked a hypothetical question as to the subject's capacity to choose right from wrong on the day of the robbery. It would serve no good purpose to examine minutely appellant's claim that the hypothetical question failed to include all the elements of appellant's history. We have carefully examined the hypothetical and compared it with the facts of appellant's background as a part of our determination of the sufficiency of the evidence.

Based upon our extended review of the record in this case, we must conclude that the evidence introduced by the Government is not sufficient to sustain the conviction. It is our considered judgment, in the light of appellant's long and consistent history of insanity, that reasonable men must necessarily have possessed a reasonable doubt as to his sanity on the date of the robbery in 1952. The Government has failed to sustain its burden of proving this essential element beyond a reasonable doubt.

We hold that the district court erred in denying appellant's motion for acquittal. No good purpose could be served in ordering a new trial. 28 U.S.C.A. § 2106. Indeed, neither party has requested a new trial.

The judgment appealed from is reversed, and this cause is remanded to the district court with directions to vacate such judgment and to enter an order granting appellant's motion for acquittal and enter an appropriate judgment thereon.

Reversed and remanded.