United States, Appellee

v.

Dennis P. COLLINS, Captain
U.S. Army, Appellant

No. 01-0664

Crim. App. No. 9900937

_____

United States Court of Appeals for the Armed Forces

Argued April 20, 2004

Decided August 25, 2004

BAKER, J., delivered the opinion of the Court, in which GIERKE, EFFRON, and ERDMANN, JJ., joined. CRAWFORD, C.J., filed a separate opinion concurring in the result.

Counsel

For Appellant: Captain Danyele Jordan (argued); Colonel Robert D. Teetsel, Lieutenant Colonel Mark Tellitocci, Major Allyson G. Lambert, and Captain Craig A. Harbaugh (on brief).

For Appellee: Captain Edward E. Wiggers (argued); Lieutenant Colonel Margaret B. Baines, Lieutenant Colonel Virginia G. Beakes, and Lieutenant Colonel Lauren B. Leeker (on brief); Major Natalie A. Kolb.


Military Judge: Gary Holland


**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION**.

United States v. Collins, No. 01-0664/AR

Judge BAKER delivered the opinion of the Court.

At a general court-martial composed of military judge alone, Appellant was convicted, contrary to his pleas, of absence without leave, disobedience of a superior commissioned officer, failure to obey a lawful order, fleeing apprehension, assault upon a military policeman in the execution of his duties, and an offer of violence against a superior commissioned officer in violation of Articles 86, 90, 92, 95, 128, Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 886, 890, 892, 895, and 928 (2000), respectively. He was sentenced to confinement for ten months, total forfeiture of all pay and allowances, and dismissal. The convening authority approved the adjudged sentence and the Court of Criminal Appeals, in a per curiam opinion, affirmed. United States v. Collins, ARMY 9900937 (A. Ct. Crim. App. December 4, 2000). We reverse.

The critical question in this case is whether the military judge should have engaged in further inquiry into Appellant's mental health in light of the nature of the original Rule for Courts-Martial 706 [hereinafter R.C.M.]

evaluation and the examining physician's apparent change of view during the trial.[1]

BACKGROUND

Appellant was a commissioned officer with 14 years of service at the time of the charged offenses. While serving in Saudi Arabia in 1997, Appellant notified his command of security concerns he had regarding the lack of chemical alarms, exceptions to policy for searching vehicles, as well as the lack of a secure water supply. Dissatisfied with the response he received from his command, Appellant went outside his chain of command and sent a letter to the Central Command Combatant Commander addressing these security practices and his concern for his troops.

Although various documents presented at Appellant's court-martial "established," according to the Government's

---

[1] This Court granted review of the following issues:

    I.    WHETHER THE SANITY BOARD ORDERED BY THIS COURT HAS GENERATED NEW EVIDENCE NOT DISCOVERABLE BY DUE DILIGENCE AT THE TIME OF TRIAL, AND, IF SO, WHETHER THE NEW EVIDENCE, WHEN VIEWED IN THE LIGHT OF ALL OTHER PERTINENT EVIDENCE, WOULD HAVE PRODUCED A SUBSTANTIALLY MORE FAVORABLE RESULT FOR APPELLANT. SEE R.C.M. 1210(f).

    II.    WHETHER, IN THE ALTERNATIVE TO ISSUE I, AND IN LIGHT OF THE APPELLATE SANITY BOARD'S FINDINGS THAT APPELLANT WAS NOT COMPETENT TO STAND TRIAL, APPELLANT WAS SUBSTANTIALLY PREJUDICED WHEN THE MILTIARY JUDGE FAILED TO ORDER SUA SPONTE A SECOND SANITY BOARD. SEE R.C.M. 909(d).

Brief, "that some of Appellant's assertions" regarding the situation in Saudi Arabia "had some basis in fact," he returned to Fort Bragg where he was denied his anticipated assignment as the brigade adjutant and instead received permanent change of station orders to American Samoa. While working as the training officer for National Guard soldiers in American Samoa, Appellant sent letters and emails to his military superiors regarding what he believed to be an ongoing conspiracy involving black-marketing and corruption. In light of Appellant's actions, his commander sent him to Tripler Army Medical Center in Hawaii for a psychological evaluation. In August 1998, psychiatrists at Tripler diagnosed Appellant with delusional disorder.[2] The psychiatrists noted Appellant's "thought content was of a non-bizarre delusional quality and reality testing seemed inconsistent" and his "insight, judgment, and impulse control are questionable." Although the psychiatrists ultimately cleared Appellant to return to duty, they commented that "given his propensity for errors in judgment, command needs to determine whether [Appellant] can continue to be an asset for the Army."

---

[2] "The essential feature of Delusional Disorder is the presence of one or more nonbizarre delusions that persist for at least one month[.]" Diagnostic and Statistical Manual of Mental Disorders 296 (4th ed. 1994).

4

During a subsequent examination at Tripler in September 1998, Appellant was diagnosed with adjustment disorder[3] instead of delusional disorder. In light of this evaluation, Appellant was placed on an "S-3 profile" for six months beginning on September 14, 1998. The S-3 profile required that Appellant be moved to a location where he could receive close monitoring by an Army psychiatrist or psychologist with enough mental health resources to support weekly counseling or psychotherapy. On September 24, 1998, Appellant submitted a letter of resignation to his battalion commander, but the resignation was not immediately accepted. On October 22, 1998, Appellant received a poor performance report indicating that Appellant "definitely should not lead soldiers in combat" and evaluated his potential as "below center of mass do not retain."

Because Appellant's request for resignation had not yet been accepted, he began out-processing from the Army on his own volition. After completing most of his out-processing and requesting a permanent change of station, Appellant went to the airport in Hawaii en route to his

---

[3] "The essential feature of an Adjustment Disorder is the development of clinically significant emotional or behavioral symptoms in response to an identifiable psychosocial stressor or stressors." Id. at 623.

home in New York. When confronted at the airport by a member of his unit, Appellant refused to return to base because he believed the "orders to be completely bogus" as he was no longer in the Army. After spending six months at his home, Appellant went to Fort Hamilton, New York, on May 19, 1999, to determine why he was not being paid. Appellant was informed that he was absent without leave and was returned to military control. Because the Army considered Appellant a deserter, he was sent to the Personnel Control Facility at Fort Knox, Kentucky.

While at this facility, Appellant relayed his conspiracy theories to the commander, Major (MAJ) Harris. Concerned with Appellant's mental stability, MAJ Harris ordered Appellant to undergo a mental health evaluation. The results of this assessment indicated Appellant was "sound enough to face any administrative actions that [the facility] needed to do." On June 28, 1999, MAJ Harris ordered Appellant to have another examination in the form of a R.C.M. 706 sanity board conducted by Colonel (COL) Richmond. Appellant, however, ignored the order because he believed it to be "an illegal immoral [sic] order."

Upon learning of Appellant's refusal to go to the evaluation, MAJ Harris confronted Appellant. At the time of this confrontation, Appellant was watching television

and playing pool. When MAJ Harris ordered Appellant to give him the pool cue, Appellant jumped to his feet and made threats against MAJ Harris. Prior to being subdued, Appellant threatened MAJ Harris with the pool cue, ran away from MAJ Harris and four military policemen, and swung the pool cue at a military policeman. Appellant was subsequently apprehended by military police.

Later that day at Appellant's jail cell, COL Richmond conducted Appellant's one person sanity board that had originally been scheduled for earlier that morning. COL Richmond, the Chief of Behavioral Medicine at Ireland Army Community Hospital at Fort Knox, Kentucky, previously performed between 10 to 15 sanity boards. After examining Appellant for two hours, COL Richmond diagnosed Appellant as having delusional disorder. COL Richmond did not review Appellant's prior mental health records from Tripler Army Medical Center during this examination.

COL Richmond compiled the results of the sanity board later that day. In his written report, COL Richmond concluded that Appellant's thought content contained "pervasive beliefs of probable delusional nature in the conspiratorial wrong doing [sic] of high ranking Army officials across many years and several different units." COL Richmond noted Appellant's "delusions were not bizarre

and could be seen as plausible if they were not so pervasive and resistant to any other interpretation." Ultimately, COL Richmond concluded that Appellant was "fully capable of understanding the nature of the proceedings and to assist in his defense. His cognitive deficits appear to be limited only to areas of his delusional belief system." Appellant was subsequently charged with two specifications of failure to obey a lawful order, desertion, disobedience of and disrespect to a superior commissioned officer, fleeing apprehension, two specifications of assault upon a military policeman in the execution of his duties, two specifications of wrongfully communicating a threat, and an offer of violence against a superior commissioned officer.

Prior to trial, Appellant requested the appointment of Dr. Patrick Burba as a defense psychiatric expert. Due to financial reasons, including the convening authority's approval of less than half of defense counsel's requested funding for Dr. Burba's assistance, the only help Dr. Burba provided the defense was a letter indicating he was "unable to determine whether [Appellant's] mental disease rendered him unable to appreciate the nature, quality, or wrongfulness of his conduct." Dr. Burba also noted that "many of [Appellant's] actions and decisions during the

8

time in question were at least moderately influenced by his delusional interpretation of events." Notwithstanding these opinions, Dr. Burba determined Appellant "was able to clearly state the nature of the court-martial, the roles of defense and prosecution counsel, the charges against him, the[]potential sentence if found guilty, and the behavior expected of him during the court-martial."

During trial, COL Richmond testified that Appellant's ability to function normally was limited to areas that did not involve his delusional beliefs and that Appellant's delusions would preclude him from performing military duties. When questioned whether Appellant's offenses stemmed from his delusions, COL Richmond testified that an individual with a delusional disorder would "probably react consistently with their delusion." COL Richmond further indicated that Appellant's reaction to the commander of the Personnel Control Facility was consistent with his delusional disorder. "[H]is belief system at the time was that these were individuals who were hostile towards him, who were acting on behalf of an agency, the US Army, of which he was no longer a member and over which they had no legitimate authority over him."

Trial counsel asked COL Richmond, "[D]o you recall in your report saying that the accused was able to appreciate

the nature and quality of the wrongfulness of his conduct for the 5 November charges?" COL Richmond responded, "I do recall that." When asked why he said that, COL Richmond replied, "Because he told me that." Trial counsel also inquired of COL Richmond, "[W]ould your belief to [sic] be that the accused's decisions and overall behavior during this period was basically-he understood the nature and quality of the wrongfulness of his conduct[?]" COL Richmond answered, "I don't believe he did." Additionally, trial counsel asked COL Richmond, "Sir, would your--with your idea of what specific intent means, after evaluation of the accused, in your opinion, do you believe Captain Collins could have had the mental capacity to form the requisite specific intent to permanently remain away from his unit, his unit of original assignment?" COL Richmond responded, "I believe Captain Collins being a very intelligent man could have the specific intent to do just about anything, so to answer your question, yes, he could have."

Following Appellant's conviction and separation from the Army, he experienced legal difficulties in the state of New York. In light of these problems, Appellant underwent a psychiatric evaluation on November 6, 2000. This psychiatrist diagnosed Appellant with delusional disorder

and opined that Appellant "has no insight into his illness and (his) judgment is poor." Pursuant to this Court's order, Appellant underwent a second sanity board composed of two psychiatrists on April 15, 2002. This sanity board noted that Appellant "is not presently suffering from a mental disease or defect rendering him unable to understand the nature of the proceedings against him or to cooperate in his defense." The board also stated that Appellant "was competent to participate in appellate proceedings at the time of this evaluation." He "had a firm grasp of the factual aspects of legal proceedings, and clearly understood the nature of the charges against him, the penalties imposed by his initial court-martial, and potential remedies available to him through the appellate process."

The board continued by explaining, "These cognitive aspects of competency have never been at issue in [Appellant's] case; rather, the concern is whether his delusions would render him unable to conduct or cooperate intelligently in his own defense. This would appear to have been the case when his delusions were active, leading him to withhold information and opinions from his attorney and evaluators and to seek prosecution in order to gain a public forum to espouse his delusional beliefs." However,

according to the sanity board, Appellant "had been restored to competency last year by adequate treatment . . . and was free of such delusions at the time of this evaluation." Finally, the board concluded that, at the time of the offenses, Appellant had a delusional disorder and "was unable to appreciate the nature and quality or wrongfulness of his conduct. Whether or not he understood that technically his conduct appeared to be unlawful, he did not appreciate it was wrongful, but believed it to be necessary."

## DISCUSSION

Appellant contends trial defense counsel presented enough evidence during trial to raise doubts about Appellant's mental competency. Appellant further suggests that his irrational and incoherent trial testimony, along with COL Richmond's testimony contradicting the written sanity board report, triggered the military judge's responsibility to conduct a second sanity board.

The Government maintains Appellant failed to establish sufficient doubt regarding his mental competency or mental responsibility. In support of this position, the Government relies on Appellant's four previous mental health evaluations. Moreover, the Government argues that Appellant's own trial defense counsel did not question

Appellant's competency since he made no objections or motions at trial. Therefore, according to the Government, Appellant did not create enough doubt about his mental competency or mental responsibility to require the judge to order another sanity board.

The arguments presented by the parties raise questions regarding Appellant's capacity[4] to stand trial as well as his mental responsibility for the charged offenses. R.C.M. 909 addresses an accused's capacity to stand trial: "No person may be brought to trial by court-martial if that person is presently suffering from a mental disease or defect rendering him or her mentally incompetent to the extent that he or she is unable to understand the nature of the proceedings against them or to conduct or cooperate intelligently in the defense of the case." R.C.M. 909(a). Mental capacity is a question of fact. R.C.M. 909(e)(1). Mental capacity will be presumed unless the contrary is established by a preponderance of the evidence. R.C.M. 909(b),(e)(2).

---

[4] The parties in their briefs and at oral argument framed their arguments in terms of competency and mental responsibility. We note that the Rules for Courts-Martial "use the term 'mental capacity' to refer to what civilian courts call competency." Captain Margaret A. McDevitt, Defense Counsel's Guide to Competency to Stand Trial, Army Law., 33, 33 (March 1988). For the purpose of this opinion and in light of counsel's arguments, we use the terms interchangeably.

Lack of mental responsibility is an affirmative defense that must be raised and proven by Appellant by clear and convincing evidence. See R.C.M. 916(k)(1)-(3)(a). See also United States v. Cosner, 35 M.J. 278, 280 (C.M.A. 1992)(citing United States v. Ramsey, 28 M.J. 370, 371 n.2 (C.M.A. 1989)). An accused is presumed to be mentally responsible at the time of the alleged offenses until the accused establishes by clear and convincing evidence that he was not mentally responsible at the time of the alleged offenses. R.C.M. 916(k)(3)(A). "Clear and convincing evidence is that weight of proof which 'produces in the mind of the factfinder a firm belief or conviction' that the allegations in question are true." United States v. Martin, 56 M.J. 97, 103 (C.A.A.F. 2001)(citations omitted).

Although an accused bears the burden of introducing evidence to establish lack of mental responsibility, R.C.M. 706(a) provides,

> If it appears to any commander who considers the disposition of charges, or to any investigating officer, trial counsel, defense counsel, military judge, or member that there is reason to believe that the accused lacked mental responsibility for any offense charged or lacks capacity to stand trial, that fact and the basis of the belief or observation shall be transmitted through appropriate channels to the officer authorized to order an inquiry into the

14

> mental condition of the accused.  The
> submission may be accompanied by an
> application for a mental examination under
> this rule.

The purpose of the R.C.M. 706 sanity board "is to determine if an accused 'lacks capacity to stand trial' or 'lacked mental responsibility for any offense charged.'" United States v. Murphy, 50 M.J. 4, 12 (C.A.A.F. 1998)(quoting R.C.M. 706).  Although concerns emerged during trial regarding Appellant's mental competency and mental responsibility, for the reasons expressed below, this case hinges on the military judge's response to questions raised concerning Appellant's mental responsibility.

A "military judge may order a mental examination of the accused regardless of any earlier determination by the convening authority."  R.C.M. 706(b).  As a result, the military judge in Appellant's case had the authority and the responsibility to determine whether a second sanity board needed to be convened in light of COL Richmond's testimony at trial.  See Drope v. Missouri, 420 U.S. 162, 180 (1975); see also Short v. Chambers, 33 M.J. 49, 52 (C.M.A. 1991).  The question of whether an additional psychiatric examination is "necessary rests within the discretion of the military judge and is reviewable only for

abuse of discretion." United States v. Carpenter, 37 M.J. 291, 298 (C.M.A. 1993)(citing United States v. Frederick, 3 M.J. 230, 232-33 (C.M.A. 1977)). Thus, we test a military judge's decision whether to order additional inquiry into an accused's mental responsibility for abuse of discretion. See United States v. Gray, 51 M.J. 1, 13 (C.A.A.F. 1999).[5]

COL Richmond testified that after examining Appellant for two hours he diagnosed him with delusional disorder. He explained that delusional disorder is a severe mental disease or defect that is "different from other psychotic disorders in that the psychosis is limited to specific delusions as opposed to, you know, all aspects of life, and reality testing, the ability to determine fact from fiction, reality from unreality, is essentially maintained across a broad spectrum of other activities with the exception of the delusion beliefs." COL Richmond further explained that he based his opinions regarding Appellant's requisite intent with respect to the charged offenses "on my perception that his belief system at the time was that

---

[5] "Legal error (i.e., an abuse of discretion) occurs if the findings of fact upon which he [the judge] predicates his ruling are not supported by the evidence of record; if incorrect legal principles were used by him in deciding this motion; or if his application of the correct legal principles to the facts of a particular case is clearly unreasonable." United States v. Gray, 51 M.J. 1, 13 (C.A.A.F. 1999)(quoting United States v. Williams, 37 M.J. 352, 356 (C.M.A. 1993)).

these individuals who were hostile towards him, who were acting on behalf of an agency, the US Army, of which he was no longer a member and over which they had no legitimate authority over him."

When asked whether Appellant's testimony at trial changed his diagnosis, COL Richmond responded, "No, it has not." But he also testified that Appellant could function pretty normally "in all the areas that are not involved in his delusional belief system." (Emphasis added.) When asked on cross-examination, "28 June, would that same-- would your belief to be that the accused's decisions and overall behavior during this period was basically--he understood the nature and quality of the wrongfulness of his conduct as well, those days?" COL Richmond replied, "I don't believe he did." Nonetheless, when questioned whether Appellant "could have had the mental capacity to form the requisite specific intent to permanently remain away from his unit," COL Richmond responded, "I believe Captain Collins being a very intelligent man could have the specific intent to do just about anything, so to answer your question, yes, he could have."

At this point in the trial, the military judge had a responsibility to consider whether COL Richmond, the sole member of Appellant's sanity board, had changed his

diagnosis regarding Appellant's mental responsibility and whether further inquiry was needed.  For example, in United States v. Bray, 49 M.J. 300, 302 (C.A.A.F. 1998), when testimony at trial raised the question of whether the appellant was responsible for his actions despite the mental responsibility findings previously made by a sanity board, the trial judge halted the proceedings and advised the appellant of the possibility of a mental responsibility defense.  We believe the military judge should have done something more in this case as well.

As noted above, the Rules for Courts-Martial permit additional mental health inquiry at any point during a court-martial proceeding.  Although this Court has no case law directly addressing a military judge's responsibility to order additional inquiry when questions regarding an accused's mental responsibility are raised during trial, such a process is consistent with the federal approach of addressing questions of competence that arise during trial.[6]

---

[6] See United States v. Drope, 420 U.S. 162, 180 (1975)("There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated."); see also Walton v. Angelone, 321 F.3d 442, 459 (4th Cir. 2003)("Even if a defendant is mentally competent at the beginning of the trial, the trial court must continually be alert for changes which would suggest that he is no longer

In this case, the military judge was aware of the following:  COL Richmond, a defense witness, was the sole witness testifying about Appellant's mental capacity and mental responsibility.  COL Richmond's testimony was based on his R.C.M. 706 sanity board evaluation of Appellant. This evaluation occurred on June 28 after Appellant's arrest and confinement.  The evaluation consisted of a two-hour interview at Appellant's jail cell.  The military judge was also aware Appellant had been referred for psychological evaluations on three prior occasions and that COL Richmond did not review these evaluations before Appellant's R.C.M. 706 sanity board.  COL Richmond also testified that his conclusion that Appellant could understand the wrongfulness of his actions was based on Appellant's own belief that he understood the wrongfulness of his actions.  It was in this testimonial context that COL Richmond appeared to contradict his own R.C.M. 706 conclusions when he was asked "would your belief to [sic] be that the accused's decisions and overall behavior during this period was basically-he understood the nature and

---

competent.")(citing Drope, 420 U.S. at 180 ("We conclude that when considered together with the information available prior to trial and the testimony of petitioner's wife at trial, the information concerning petitioner's suicide attempt created a sufficient doubt of his competence to stand trial to require further inquiry on the question.")).

quality of the wrongfulness of his conduct" and stated in response "I don't believe he did."

This was not a tangential or supplementary question, but the central question of the mental responsibility inquiry. In the context presented, such a statement from the only doctor testifying to Appellant's mental responsibility warranted further inquiry. Although this inquiry may, and perhaps should have come from defense counsel, the Rules for Courts-Martial are clear. Mental competence and responsibility are the duty of all trial principals. See R.C.M. 706(a). In the courtroom, however, the military judge is ultimately responsible for ensuring that R.C.M. 706 is followed. As a result, we conclude the military judge abused his discretion by not ordering further inquiry into Appellant's mental responsibility at the point in the trial when COL Richmond appeared to change his testimony and conclusion. This conclusion is reinforced by COL Richmond's earlier testimony regarding the scope of his evaluation of Appellant. He testified that he did not review Appellant's mental health history, including repeated mental health evaluations ordered by the Army.[7] As a result, Appellant was prejudiced when his trial

---

[7] Although the military judge's decision must be evaluated based on what was known to him at the time of trial, the

proceeded to conclusion without further and complete
inquiry into his mental responsibility.

DECISION

The decision of the United States Army Court of
Criminal Appeals is reversed.[8]  The findings and sentence
are set aside, and the record of trial is returned to the
Judge Advocate General of the Army.  A rehearing is
authorized.

---

results of the second sanity board and the psychiatric
evaluation conducted in New York both support the
conclusion that the military judge in this case needed to
inquire further into Appellant's mental responsibility.

[8] In light of our decision, Appellant's petition for new
trial is denied as moot.

United States v. Collins, No. 01-0664/AR

CRAWFORD, Chief Judge (concurring in the result):

Because there is a reasonable doubt that a different verdict might result if a trier of fact considers the results of the post-trial Rule for Courts-Martial 706 [hereinafter R.C.M.] inquiry directed by this Court, we should grant Appellant's petition for a new trial.[1]  Rather than grant this well-supported relief, the majority unnecessarily rejects decades of settled practice in this area, applying de novo review to find error. In so doing, the majority gravely confuses the concept of mental capacity with the defense of mental responsibility and changes the obligation on military judges.  I cannot join the majority in imposing on military judges such an unwarranted and ill-defined burden.

> Administration of justice according to law means administration according to standards, more or less fixed, which individuals may ascertain in advance of controversy and by which all are reasonably assured of receiving like treatment.[2]

Like the majority, I begin my analysis by citing United States v. Carpenter:  "The question whether additional psychiatric examination is necessary rests within the discretion of the military judge and is reviewable only for abuse of

---

[1] United States v. Breese, 47 M.J. 5 (C.A.A.F. 1997).

[2] Roscoe Pound, Justice According to Law, 13 Colum. L. Rev. 696, 705 (1913).

discretion".[3]  This citation is important in understanding the majority's position for at least two reasons.

First, the majority's citation to  "abuse of discretion" is curious.  Other than noting this legal standard, their analysis is clearly de novo, notwithstanding their later conclusion, bereft of discussion or guidance, that "the military judge abused his discretion by not ordering further inquiry into Appellant's mental responsibility."[4]  Discussion of abuse of discretion appears nowhere in the majority's multi-page analysis.  Instead, the opinion predicates error on the military judge's failure to order a second sanity board, given the "nature of the original" board and Colonel (COL) Richmond's partial departure during his testimony on the merits of the case from the findings of the sanity board he conducted.  With good reason, the majority fails to offer any citation of authority to support the conclusion that, in the wake of COL Richmond's testimony, the evidentiary posture "warranted further inquiry." I would follow our precedent and determine whether the military judge's failure to order, sua sponte, an additional inquiry into Appellant's mental responsibility was "arbitrary, capricious, or

---

[3] 37 M.J. 291, 298 (C.M.A. 1993)(emphasis added).

[4]  __ M.J. (20).

2

unrestrained,"[5] or "arbitrary, fanciful, clearly unreasonable, or clearly erroneous," or amounted to more than a difference of opinion.[6]

Second, the issue in Carpenter was mental capacity ("competence") to stand trial.[7] For that reason, its value as an analogue to mental responsibility cases is limited. We would be wise to tread carefully when comparing the duty of a military judge to address and resolve "competence" as a matter of law, with his or her concomitant duties, in a bench trial, as both the trier of fact and source of law, when "responsibility" is an issue.[8] Competence must be resolved as an interlocutory matter of law, while responsibility must be resolved by the finder of law and trier of fact.[9] As the majority correctly notes, if the military judge has reason to question either the mental competence or responsibility of an accused, he or she "may order a mental examination of the accused regardless of any earlier

---

[5] United States v. Frye, 8 C.M.A. 137, 141, 23 C.M.R. 361, 365 (1957)(Latimer, J., concurring in the result).

[6] United States v. Miller, 46 M.J. 63, 65 (C.A.A.F. 1997)(citing United States v. Travers, 25 M.J. 61, 62 (C.M.A. 1987)).

[7] Like the majority, I note that these terms are used interchangeably.

[8] See Arts. 50a and 51(d), Uniform Code of Military Justice [hereinafter UCMJ], 10 U.S.C. §§ 850a and 851(d)(2000).

[9] Compare R.C.M. 909(d)-(e) with R.C.M. 921(c)(4).

3

determination by the convening authority,"[10] subject to review for abuse of discretion.[11]  If the military judge finds that an accused is not competent, trial may not proceed,[12] and again the military judge's ruling is tested for abuse of discretion.[13]

In contrast to these legal determinations is the factual determination made by the trier of fact when the defense of lack of mental responsibility is raised.  If an accused prevails on the issue of mental responsibility before the trier of fact, the result is a verdict of "not guilty only by reason of lack of mental responsibility."[14]  Such a verdict is then followed by the procedures in R.C.M. 1102A, but is not subject to disapproval by the convening authority,[15] appeal by the United States,[16] or review by either a Court of Criminal Appeals or this Court.[17]  Importantly, Article 51(b) and R.C.M. 916(k)(3)(C) require

---

[10] R.C.M. 706(b)(2).

[11] United States v. Frederick, 3 M.J. 230 (C.M.A. 1977).

[12] R.C.M. 909(e)(2); Short v. Chambers, 33 M.J. 49, 51 (C.M.A. 1991).

[13] United States v. Proctor, 37 M.J. 330, 336 (C.M.A. 1993).

[14] Art. 50a(c)(3), UCMJ, 10 U.S.C. § 850a(c)(3) (2000); R.C.M. 921(c)(4).

[15] R.C.M. 1107(b)(4)

[16] Art. 62, UCMJ, 10 U.S.C. § 862 (2000).
[17] Arts. 66, 67, UCMJ, 10 U.S.C. §§ 866, 867 (2000).

resolution of mental responsibility by the trier of fact and prohibit interlocutory determination of mental responsibility.

Notwithstanding a plainly announced and historically recognized legislative scheme, and without citation of authority or explanation, the majority decrees that "when questions regarding an accused's mental responsibility are raised during trial," the military judge's responsibility to order additional inquiry "is consistent with the federal approach of addressing questions of <u>competence</u> that arise during trial."[18]  This "consistency" is observed for the sole purpose of importing standards from federal decisions on the question of competence that have no application whatever to questions of mental responsibility.  In fact, the majority ignores both Article 36[19] and significant federal case law emphasizing that the two issues are wholly incongruent.[20]

In this case, the military judge was not asked by either party to rule on a request for further inquiry into Appellant's mental responsibility.  He was asked to find, as a matter of

---

[18]  __ M.J. <u>(19)</u> (emphasis added).

[19] UCMJ, 10 U.S.C. § 836 (2000).

[20] <u>See, e.g.</u>, <u>United States v. Bartlett</u>, 856 F.2d 1071 (8th Cir. 1988); <u>United States v. Hollis</u>, 569 F.2d 199 (3d Cir. 1977); <u>United States v. Mercado</u>, 469 F.2d 1148 (2d Cir. 1972); <u>United States v. Taylor</u>, 437 F.2d 371 (4th Cir. 1971); <u>Floyd v. United States</u>, 365 F.2d 368 (5th Cir. 1966); <u>United States v. Westerhausen</u>, 283 F.2d 844 (7th Cir. 1960).

fact (if he first found Appellant guilty), whether Appellant had proved by clear and convincing evidence that, at the time he committed the offenses of which he was found guilty, he lacked mental responsibility for those acts.[21] This is not to say that the military judge did not retain, for the duration of the proceedings, a responsibility to be alert for anything that might raise a question concerning either Appellant's competence or responsibility.[22] Because military judges are presumed to know and apply the law, there is no reason to believe that the military judge was not cognizant of this responsibility or that he failed to discharge it accordingly.[23] This principle applies even when the reasoning of the military judge is not plain on the record.[24]

Two issues are _not_ before us: (1) whether the evidence is sufficient as a matter of law to support the military judge's determination that Appellant's lack of mental responsibility was not proved by clear and convincing evidence; and (2) whether we, with the clarity of hindsight and the assurance of an additional sanity board, would have done things differently, had we been the military judge. After reviewing the military judge's

---

[21] See generally R.C.M. 921(c)(4).

[22] R.C.M. 916(k)(3)(B); Frederick, 3 M.J. at 232-33.

[23] United States v. Prevatte, 40 M.J. 396, 398 (C.M.A. 1994).

[24] United States v. Vangelisti, 30 M.J. 234 (C.M.A. 1990).

actions solely for abuse of discretion, I conclude that he did not err.

A.  Competence vs. Responsibility.

No evidence at trial placed in question the competence of Appellant to stand trial, nor was that issue raised by the defense under R.C.M. 909, or by any other party.  What was litigated at trial was the mental responsibility of Appellant at the time of the offenses.  Any reference by the majority to mental competence or capacity is inapposite and may unintentionally suggest to military judges that there is a factually and legally valid analytical connection between the two.  For this reason, I must specifically dissent from the majority's conclusions.

B.  Defense of Lack of Mental Responsibility.

There is no indication that the military judge had an opportunity to examine the report of the R.C.M. 706 inquiry until it was offered into evidence by the defense during the defense case, nor did either party contend that the report was insufficient, that the inquiry was improper, or that COL Richmond was unqualified.  Nonetheless, the military judge was aware that the defense would place the accused's mental responsibility in issue.  Far from being uninvolved, the military judge during trial on the merits, after explaining in open court the purpose for his inquiry, questioned COL Guthrie,

Majors O'Dell and Harris, and Specialist Austin (all witnesses for the prosecution) on matters pertinent to Appellant's mental responsibility. Counsel frequently had additional questions of these witnesses after inquiry from the bench. In addition, the military judge briefly questioned Appellant regarding his duty status and state of mind. Appellant's testimony was lucid, consistent, and characteristic of those who elect to testify in support of their lack of mental responsibility.

During cross examination of COL Richmond, the defense expert on this issue, COL Richmond gave an answer that appeared to conflict with his findings while acting as a one-member "sanity board," pursuant to R.C.M. 706. As the defense witness request for COL Richmond does not contain the synopsis required by R.C.M. 703, we have no way of knowing whether COL Richmond's testimony at trial was a surprise to the defense, much less to the government. If either was surprised, he hid it well, making very little additional inquiry into the area. Assuming, arguendo, that COL Richmond's momentary departure from the R.C.M. 706 report was unexpected, the remainder of his testimony (as quoted by the majority) is sufficiently equivocal to significantly reduce the weight of his "I don't believe he did," comment. Even so, COL Richmond's, "I don't believe he did" answer contributed to and directly supported Appellant's lack of mental responsibility defense.

8

The defense counsel, who likely knew far more about his client's mental state than did any other party to the trial, did not object when COL Richmond changed his testimony.  At that point, with virtually no other evidence to carry the defense's burden to prove clearly and convincingly Appellant's lack of mental responsibility, the defense counsel may well have welcomed assistance from this perhaps unexpected quarter.

As we strongly advised in United States v. Quintanilla,[25]

> [t]he Manual also emphasizes the importance of an impartial judiciary, advising military judges that when carrying out their duties in a court-martial, they "must avoid undue interference with the parties' presentations or the appearance of partiality." RCM 801(a)(3) (Discussion).  The military judge must exert his authority with care, so as not to give even the appearance of bias for or against either party.

If, as the majority insists was required of him, the military judge had intervened and, over defense objection,[26] directed a second sanity board, on appeal we would be evaluating two far more deserving issues:  (1) did the military judge abuse his discretion in ordering an additional sanity inquiry?; and (2) did the military judge

---

[25] 56 M.J. 37, 43 (C.A.A.F. 2001)(footnote omitted).

[26]  Not a mere whimsy, given Appellant's expressed belief that the Army was using mental status inquiries to deny him due process.  Appellant testified that he resisted additional mental evaluation because he thought it was being used to deny him his day in court, and that some of the acts with which he was charged were undertaken for the purpose of getting him to a court-martial.

depart his impartial role when, immediately following testimony favorable to the primary defense raised by Appellant, he sua sponte stopped the proceedings to seek expert impeachment of that testimony?

　　C.　Responsibility of the Military Judge.

Neither counsel commented on, contradicted, or argued COL Richmond's seemingly anomalous interjection.  No party to the proceedings suggested or requested any additional inquiry into the mental responsibility of Appellant.  The report of the R.C.M. 706 board, though not a model inquiry, is regular on its face and no question was raised at trial regarding COL Richmond's qualifications or the procedures he employed.  Tellingly, the record of trial contains no reference to any standard that COL Richmond failed to meet.

Nonetheless, the majority finds that the military judge erred, and in so doing, "puts trial judges in a unique 'box.' Military judges now must assume the role we have always left to competent counsel" to present evidence in support of affirmative defenses.[27]  Are military judges now required to ask presumably competent counsel on the record if they are challenging the validity of a facially valid R.C.M. 706 report?  Are military judges now required seek an advance copy of the report, examine

---

[27] United States v. Wiesen, 57 M.J. 48, 55 (C.A.A.F. 2002)(Crawford, C.J., dissenting).

10

it and inquire into its basis, assess the qualifications of those producing the report, and sua sponte determine whether the report is sufficient? Just as importantly, are military judges now required to provide another "bite at the apple" to the government in any case in which an expert witness for the defense unexpectedly testifies in support of an accused's lack of mental responsibility?

In deciding, without having seen any witness testify and, in particular, without having evaluated Appellant's in-court demeanor on and off the stand, "we believe the military judge should have done something more in this case,"[28] the majority now requires not only that military judges meet the qualifications of Article 26,[29] but that they possess a measure of clairvoyance that should not reasonably be required of any human. Given the choice between this course of action and granting Appellant a

---

[28] __ M.J. (18). In support of this conclusion, the majority relies on United States v. Bray, 49 M.J. 300 (C.A.A.F. 1998), a case in which the military judge was required by R.C.M. 910(e) and United States v. Jemmings, 1 M.J. 414 (C.M.A. 1976) to advise the accused of the defense of mental responsibility because that defense was raised during sentencing following a guilty plea. By concluding that "the military judge should have done something more in this case as well," the majority enigmatically hints that henceforth, in contested cases, the military judge would be wise to advise the accused of a potential defense whenever he believes it has been raised by the evidence, during any part of the proceedings.

[29] UCMJ, 10 U.S.C. § 826 (2000).

new trial pursuant to R.C.M. 1210, I have no difficulty deciding that the latter path is the more prudent and correct.